09-1452-cv; 09-1601-cv; 09-2261-cv
Doninger v. Niehoff

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term 2009

(Argued: January 12, 2010          Decided: April 25, 2011)

Docket Nos. 09-1452-cv (L), 09-1601-cv (XAP), 09-2261-cv (CON)

————————————————————————

AVERY DONINGER,

*Plaintiff-Appellee-Cross-Appellant*,

-v.-

KARISSA NIEHOFF, PAULA SCHWARTZ,

*Defendants-Appellants-Cross-Appellees*.

————————————————————————

Before:        KEARSE, CABRANES, and LIVINGSTON, *Circuit Judges*.

Plaintiff-Appellee-Cross-Appellant ("Plaintiff") appeals from a district court decision granting summary judgment to Defendants-Appellants-Cross-Appellees ("Defendants") on a claim brought under 42 U.S.C. § 1983 alleging that Defendants, public school officials in Burlington, Connecticut, violated Plaintiff's rights under the First Amendment of the United States Constitution when they prohibited her from running for Senior Class Secretary in response to her off-campus internet speech. Plaintiff also appeals from the district court judgment granting summary judgment to Defendants on her Equal Protection claim, from the district court's *sua sponte* dismissal without prejudice of her claims under the Connecticut Constitution, and from the district court's determination that she failed properly to assert a claim pursuant to *Monell v. Department of Social*

*Services*, 436 U.S. 658 (1978). Defendants appeal the district court's denial of their motion for summary judgment on Plaintiff's claim that Defendants violated her First Amendment rights when Defendants prohibited Plaintiff from wearing or otherwise displaying a homemade printed t-shirt in a school assembly. Because we conclude that Defendants are entitled to qualified immunity on both First Amendment claims, and because we agree with the district court with regard to Plaintiff's other claims, the district court's judgment is affirmed in part and reversed in part. The matter is remanded for the district court to enter judgment for Defendants.

Affirmed in part and reversed in part.

> JON L. SCHOENHORN, Jon L. Schoenhorn & Associates, LLC, Hartford, Connecticut (Sara J. Packman, *on the brief*), for *Plaintiff-Appellee-Cross-Appellant*.

> THOMAS R. GERARDE, Howd & Ludorf, LLC, Hartford, Connecticut (Beatrice S. Jordan, *on the brief*), *for Defendants-Appellants-Cross-Appellees.*

DEBRA ANN LIVINGSTON, *Circuit Judge*:

We are once again called to consider the circumstances in which school administrators may discipline students for speech relating directly to the affairs of the school without running afoul of the First Amendment. More precisely, we must determine if the defendant-school-administrators before us are entitled to qualified immunity on the plaintiff-student's claims that they violated her First Amendment rights by (1) preventing her from running for Senior Class Secretary as a direct consequence of her off-campus internet speech, and (2) prohibiting her from wearing a homemade printed t-shirt at a subsequent school assembly.

Plaintiff-Appellee-Cross-Appellant Avery Doninger ("Doninger" or "Plaintiff") appeals from a January 15, 2009, decision of the United States District Court for the District of Connecticut

(Kravitz, *J.*) — as well as a March 19, 2009, denial of a motion for reconsideration — granting partial summary judgment to Defendants-Appellants-Cross-Appellees Karissa Niehoff, principal at Lewis S. Mills High School ("LMHS" or "the School") in Burlington, Connecticut, and Paula Schwartz, superintendent of the school district in which LMHS is located (together, "Defendants"), on the claim that Defendants violated Plaintiff's First Amendment rights when they prohibited her from running for Senior Class Secretary in response to a blog entry that Doninger posted from her home during non-school hours.[1]  Because we conclude that the asserted First Amendment right at issue was not clearly established, we affirm the district court's decision on the ground that Defendants were entitled to qualified immunity.  Doninger also appeals the district court's grant of summary judgment to Defendants on her Equal Protection selective-enforcement claim, its *sua sponte* dismissal without prejudice of her claims under the Connecticut state constitution, and the court's determination, on her motion for reconsideration, that she failed properly to assert a claim pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978).[2]  We affirm the district

---

[1] The grant of partial summary judgment to Defendants from which Doninger appeals is an interlocutory decision not typically appealable prior to a "final decision[ ]" in the case. *Myers v. Hertz Corp.*, 624 F.3d 537, 552 (2d Cir. 2010) (quoting 28 U.S.C. § 1291).  Here, however, we do have jurisdiction over the appeal.  On May 14, 2009, the district court certified an interlocutory appeal, pursuant to 28 U.S.C. § 1292(b), from its ruling granting Defendants qualified immunity with respect to Doninger's blog-related First Amendment claim. *See Doninger v. Niehoff*, No. 3:07-cv-1129, 2009 WL 1364890, at *2 (D. Conn. May 14, 2009).  On July 23, 2009, we granted Doninger's motion for leave to appeal the interlocutory order of the district court and consolidated her appeal with the appeal that had already been brought by Defendants, discussed *infra*.

[2] The district court refused to certify these other rulings adverse to Doninger, citing the absence of substantial grounds for difference of opinion on these questions.  However, as the court below recognized, "[w]hen a district court certifies, pursuant to 28 U.S.C. § 1292(b), a question of controlling law, the entire order is certified and we may assume jurisdiction over the entire order, not merely over the question as framed by the district court." *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 391-92 (2d Cir. 2008).  As a result, we "may address any

court's determination on these claims as well.

Defendants appeal the district court's partial denial of their motion for summary judgment, asserting that they are entitled to qualified immunity on Doninger's remaining First Amendment claim — a claim alleging that her rights were violated when Niehoff prohibited her from displaying in a school assembly a homemade t-shirt emblazoned with "Team Avery" on the front and "Support LSM Freedom of Speech" on the back. We reverse the district court on the basis that Defendants are entitled to qualified immunity on this claim as well, since, given the legal framework and the particular factual circumstances of this case, the rights at issue were not clearly established.

# BACKGROUND

## I. Factual Background

At the time of the events relevant to the instant dispute, Doninger was both on the Student Council and serving as the Junior Class Secretary at LMHS, a public high school in Burlington. The school district had in place a policy regarding eligibility to represent its schools in such positions. The district's policy stated:

> All students elected to student offices, or who represent their schools in extracurricular activities, shall have and maintain good citizenship records. Any student who does not maintain a good citizenship record shall not be allowed to represent fellow students nor the schools for a period of time recommended by the student's principal, but in no case, except when approved by the board of education, shall the time exceed twelve calendar months.

Joint Appendix ("J.A.") 251. LMHS's student handbook — which Doninger, as an LMHS student, signed, attesting that she had reviewed it with her family — specified, further, that the objectives of the School's Student Council include: (1) "[m]aintain[ing] a continuous communication channel

___

issue fairly included within the certified order." *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996).

from students to both faculty and administration, as well as among the students within the school," and (2) "[d]irect[ing] students in the duties and responsibilities of good citizenship, using the school environment as the primary training ground." *Id.* at 253.

The dispute at the heart of this case arose over the scheduling of an event called "Jamfest," an annual battle-of-the-bands concert that Doninger and other Student Council members had helped to plan. Jamfest was scheduled to take place in the School's new auditorium on Saturday, April 28, 2007, but shortly before the date of the event, the School's administrators learned that the LMHS teacher responsible for operating the auditorium's sound and lighting equipment, David Miller, would be unable to attend on that date. As a result, at an April 24 Student Council meeting, which occurred prior to the start of the school day, the students were informed that Jamfest could not be held in the auditorium without Miller, and that they had the option either to keep the scheduled date and hold the event in the cafeteria, or to find a new date. This announcement upset Doninger and her fellow organizers, who wanted to hold the event in the auditorium that weekend, as planned. Jennifer Hill, the Student Council's faculty advisor, recommended that they discuss the situation with Niehoff, the School's principal, and she accompanied them to Niehoff's office. They were unable to see Niehoff immediately, but Doninger volunteered to return to the principal's office during her study hall to help schedule a meeting for later in the day.

Thereafter, however, four Student Council members, including Doninger, decided to take immediate action. From LMHS's computer lab, they gained access to the email account of the father of one of the students. Using that account, the students sent a mass email alerting various LMHS parents, students, and others that "the Central Office [had] decided that the Student Council could not hold its annual Jamfest/battle of the bands in the auditorium" and urging them to "contact [the]

5

central office and ask that we be let [sic] to use our auditorium." J.A. 219. They did so in spite of a school email policy that specifically restricted "[a]ccess of the Internet or e-mail using accounts other than those provided by the district for school purposes."[3] *Id.* at 275. The mass email included the district office's phone number and urged recipients to call that office and forward the email "to as many people as you can." *Id.* at 219. Another email, sent later that same day, included Superintendent Schwartz's email address and a corrected phone number. Both Schwartz and Niehoff received an influx of telephone calls and emails regarding Jamfest. As a result, Niehoff was called back to her office from a planned in-service training day.

Later that day, Niehoff, who by this time had in her possession a copy of the students' first email, encountered Doninger in the hallway at school. The parties differ in their accounts of the ensuing conversation, which took place in Niehoff's office. Doninger states that Niehoff informed her about the calls and emails that had been received that day and told her that because Schwartz was upset, "Jamfest was cancelled on [April] 28th." Prelim. Inj. Hearing Tr. ("P.I. Hearing Tr.") at 262:4. Doninger testified that Niehoff left open the possibility of Jamfest happening at a later date "if [the students] play [their] cards right," but not "until after [the] talent show." *Id.* at 261:22-23. In contrast, Niehoff asserts that she never told Doninger that Jamfest was cancelled, but rather stressed that the information included in the mass email (to the effect that the auditorium could not be used) was incorrect, as "the option of rescheduling was always there if they did not want to use the cafeteria on the 28th." *Id.* at 492:3-4. Niehoff contends that she then had a discussion with

---

[3] The policy also restricted use of school computers to "school-related purposes" and use of student email accounts to "communication only with identifiable individuals or organizations with a recognized role in the school-related activity." J.A. 275. Doninger executed the Regional School District # 10 Acceptable Use Agreement on September 6, 2006, agreeing to abide by this use policy.

6

Doninger in which she told Doninger that her conduct — sending a mass email from the computer lab that contained inaccurate information, rather than working with the administration to resolve the problem — was unbecoming of a class officer.[4] Doninger, however, denies that Niehoff said anything regarding her responsibilities as a class officer. Finally, Niehoff states that she requested that Doninger, with the other senders of the email, compose a new email to correct the misinformation in the first one. Niehoff contends that Doninger agreed to do so, while Doninger denies that this conversation took place.

That night, from her home, Doninger posted a message on her publicly accessible blog hosted by livejournal.com, a website unaffiliated with LMHS. The blog post began as follows:

> jamfest is cancelled due to douchebags in central office. here is an email that we sent out to a ton of people and asked them to forward to everyone in their address book to help get support for jamfest. basically, because we sent it out, Paula Schwartz is getting a TON of phone calls and emails and such. we have so much support and we really appriciate [sic] it. however, she got pissed off and decided to just cancel the whole thing all together. anddd [sic] so basically we aren't going to have it at all, but in the slightest chance we do it is going to be after the talent show on may 18th. anddd.. [sic] here is the letter we sent out to parents.

J.A. at 167. Doninger reproduced the email that she and the other Student Council members had sent that morning and then continued:

> And here is a letter my mom sent to Paula [Schwartz] and cc'd Karissa [Niehoff] to get an idea of what to write if you want to write something or call her to piss her off more. im down.--

*Id.* Doninger next reproduced an email that her mother had sent to Schwartz earlier in the day concerning the dispute. Doninger testified that her use of the word "douchebags" in the blog post

---

[4] Peter Bogen, an assistant principal at LMHS, was present during the conversation and also recalls generally that Niehoff advised Doninger regarding her obligation to engage in appropriate communications in the resolution of conflict and to be a role model for others.

"referr[ed] to anyone involved in the cancellation of Jamfest," including Schwartz. P.I. Hearing Tr. at 379:6-7. The purpose of her blog posting, she testified, was to encourage more people to contact the administration in an effort to change its position that Jamfest could not be held in the auditorium on April 28. Several LMHS students posted comments to the blog, including one that referred to Superintendent Schwartz as a "dirty whore." J.A. at 168.

The following morning, April 25, 2007, Schwartz and Niehoff continued to receive phone calls and emails regarding Jamfest, as well as personal visits from students. In addition, during the day, a group of students gathered outside the administration office. A student later testified that the assembled students were "pretty upset" and "fired up," although he also stated that he "d[idn't] think they were going to do anything threatening." P. I. Hearing Tr. at 80:23-81:7. Doninger testified that the students were "all riled up," *id.* at 434:13, believing that Jamfest had been cancelled, and that they planned "to go and sit in the office until they got an answer," *id.* at 435:1-2. She did however claim that the students left after she spoke to them. Niehoff and Schwartz testified that on both April 24 and 25, they were forced to miss or arrived late to several school-related activities as a result of the controversy, including a health seminar, an observation of a non-tenured teacher, and a superintendents' meeting. Doninger contends that these claims are "self-serving" and that some of this supposed disruption was a product of Defendants' own choosing to devote time to resolving the Jamfest controversy.

That same morning of April 25, Doninger and the three other Student Council members who sent the mass email were called out of class to meet with Schwartz, Niehoff, Hill, Miller, and David Fortin, LMHS's Director of Building and Grounds, regarding Jamfest. The four Student Council members were again advised that the auditorium would not be available on April 28, and told that

8

Jamfest could be held in the cafeteria on that date or in the auditorium on a later date. It was agreed that Jamfest would take place in the new auditorium on June 8, 2007.[5] During this meeting, Schwartz suggested to Doninger and the other students that they should have come to her to resolve the controversy rather than sending a mass email. Schwartz asked the students to send out another email explaining that the situation had been resolved, which they did.

Doninger's blog post did not come to the attention of school officials until May 7, 2007, about two weeks later. Niehoff testified that on viewing the blog post, she was disappointed by the fact that Doninger had republished the mass email and inaccurately reported that Jamfest had been cancelled, despite the fact that Niehoff had spoken with her about the email and had worked with her to clear up any confusion as to Jamfest's scheduling. She also testified that she was disappointed by the language used in the posting, and by the fact that it "continue[d] to encourage people to incite confrontation" with Schwartz, P.I. Hearing Tr. at 508:11-12, when Niehoff had met with Doninger and had suggested that such behavior was inappropriate for a class officer. Niehoff testified that because she knew that Doninger had advanced placement exams around the time Niehoff was made aware of the blog post, she did not immediately bring the fact that she, Niehoff, and others were aware of the post to Doninger's attention. She did consult with other administrators at the School, seeking advice as to an appropriate response.

On May 17, 2007, Doninger went to Niehoff's office to accept her nomination for Senior Class Secretary. At that time, Niehoff confronted Doninger regarding the post and requested that Doninger apologize to Schwartz, show the blog entry to her mother, and withdraw her candidacy

---

[5] Jamfest was successfully held as scheduled on this date, with all but one of the scheduled bands participating.

for Senior Class Secretary. Doninger agreed to comply with the first two requests, but did not agree to the third. In response, Niehoff refused to allow Doninger to run for a senior class officer position, although Doninger was permitted to retain her current position as Junior Class Secretary. Niehoff testified at the preliminary injunction hearing that she took this action because, *inter alia*, she felt that the blog post failed to demonstrate good citizenship, which was significant because Doninger was "acting as a class officer at the time that she created the blog," P.I. Hearing Tr. at 559:7-8, and because it violated the principles governing student officers set out in the student handbook that Doninger had signed.[6] Niehoff determined that Doninger's name would not appear on the election ballot nor would she be permitted to give a campaign speech at a May 25 school assembly regarding the election. Doninger was not otherwise disciplined for her blog post.

On May 24, 2007, the day before the student election, Doninger and her mother visited a local television news station where newscasters taped an interview with them regarding Doninger's blog post and Niehoff's decision not to let her participate in the class election. Doninger requested the opportunity to make an announcement about the program in civics class later that same day, but as she was explaining this request to her teacher, an apparent supporter yelled out, "[E]veryone watch the news at six." *Id.* at 292:13-14. This disruption resulted in the student being sent to Niehoff's office.

Some time before the start of school the next day, when elections were scheduled to be held, Niehoff learned that an undetermined number of students planned to wear "Vote for Avery" t-shirts to that day's assembly, where candidates were to give speeches before approximately 600 of their

---

[6] It is uncontested that, as Niehoff asserted, class officers are automatically members at large of the Student Council.

fellow students. It was also rumored that supporters of Doninger were planning a write-in campaign on her behalf. Niehoff relayed this information to Schwartz and Vice-Principal Bogen by email early on the morning of May 25.

Niehoff's information proved largely accurate as, indeed, a group of students had planned to wear t-shirts into the assembly bearing "Team Avery" on the front and "Support LSM Freedom of Speech" on the back. At least two of these students were themselves running for office and originally intended to wear the t-shirts during their speeches, although there is nothing in the record to suggest that Niehoff was aware of this.[7] That morning, Niehoff stationed herself outside the auditorium as several hundred students made their way in through two entrances to hear the candidate speeches. A few students wearing "Team Avery" shirts attempted to enter the auditorium prior to the beginning of the assembly. Niehoff instructed them to remove their shirts.[8] One student testified that, in asking him to remove the shirt, Niehoff stated that it was "disruptive" and "set[] a bad example." P.I. Hearing Tr. at 213:19. Niehoff herself testified that she was acting to prevent the wearing of "any shirt that [she] felt would cause disruption" at the assembly, *id.* at 590:12-13, and that it was her opinion that the shirts at issue would have caused disruption. There is no evidence in the record that Niehoff (or any other school official) made any effort to prevent students from wearing the t-shirts other than at the election assembly.

At the time of the assembly, Doninger was not wearing a "Team Avery" shirt, but was

---

[7] Plaintiff claims that the t-shirts were to be worn in silent protest, an account of the students' intentions that the district court seemed to accept below, *see Doninger v. Niehoff*, 594 F. Supp. 2d 211, 225 (D. Conn. 2009). We are pointed to no evidence, however, and find none in our own search of the record, regarding the students' plans. There is also no evidence that any intentions they may have had were in any way communicated to Niehoff.

[8] She also required another student, who was wearing a different t-shirt bearing the legend "Vote for Avery," to remove it.

carrying one with her. She testified that she was going to "put it on after," *id.* at 293:21, but instead put it in a backpack when Niehoff told her the shirts were not permitted in the assembly. Doninger was permitted to enter the auditorium wearing the t-shirt she had on, which read "RIP Democracy." Even though Doninger was not a candidate and was not permitted to give a speech at the assembly, students there shouted "Vote for Avery." (In the words of one student who was present, "there wasn't screaming or anything, it's not like there was a riot, but people were yelling Avery's name, vote for Avery." *Id.* at 117:23-25.) Niehoff warned these students to be respectful.

Among the students who gave speeches before the assembled crowd were the two candidates who were in fact listed on the ballot for the position of Senior Class Secretary, including the student who ultimately was awarded the position, "A.K." Even though not on the ballot, Doninger nevertheless received a plurality of the votes for the position as a write-in candidate. Niehoff, however, in accordance with her earlier decision, awarded the position of Senior Class Secretary to A.K., who received the next highest number of votes.

## II.     Procedural History

In 2007, prior to Avery Doninger's reaching the age of majority, her mother, Lauren Doninger, filed a complaint on her behalf in Connecticut Superior Court asserting claims under 42 U.S.C. § 1983 and state law. *Doninger v. Niehoff* ("*Doninger II*"), 527 F.3d 41, 46-47 (2d Cir. 2008), *aff'g Doninger v. Niehoff* ("*Doninger I*"), 514 F. Supp. 2d 199 (D. Conn. 2007). Defendants removed the action to the United States District Court for the District of Connecticut. Lauren Doninger subsequently filed a motion for a preliminary injunction asking the court, *inter alia*, to void the election for Senior Class Secretary, to strip the title from the student to whom it had been awarded, and to require a new election in which her daughter could run. *Id.* at 47; *see also Doninger*

12

*I*, 514 F. Supp. 2d at 202. In the alternative, she asked that the School be enjoined to grant her daughter "the same title, honors, and obligations as the student elected to the position, including the privilege of speaking as a class officer at graduation." *Doninger II*, 527 F.3d at 43. After extensive development of the factual record, the district court denied the request for an injunction based on Doninger's failure to show likelihood of success on the merits. *See Doninger I*, 514 F. Supp. 2d at 218. On appeal, this Court affirmed. *Doninger II*, 527 F.3d 41.

After Avery Doninger graduated from high school, she was substituted for her mother as plaintiff. Although her request for an injunction has been mooted by her graduation, Doninger now seeks damages for the alleged violation of her constitutional rights. The district court entertained cross-motions for summary judgment, and on January 15, 2009, denied Doninger's motion and granted Defendants' motion in part and denied it in part. *See Doninger v. Niehoff* ("*Doninger III*"), 594 F. Supp. 2d 211 (D. Conn. 2009). It subsequently denied motions for reconsideration. *Doninger v. Niehoff*, No. 3:07-cv-1129, 2009 WL 763492 (D. Conn. Mar. 19, 2009). Defendants appealed the partial denial of qualified immunity and, as previously noted, Doninger was granted leave to appeal the district court's order partially granting summary judgment to Defendants.

**DISCUSSION**

The standard of review in these appeals from a partial grant and partial denial of summary judgment is *de novo*. *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009). Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also McBride*, 583 F.3d at 96.

**I.      First Amendment Claims**

As we did in *Doninger II*, we begin with some basic principles of First Amendment law. While students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969), the constitutional rights of students in public school "are not automatically coextensive with the rights of adults in other settings," *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). Instead, these rights must be applied in a manner consistent with the "special characteristics of the school environment." *Tinker*, 393 U.S. at 506. Thus, school administrators may prohibit student expression that will "materially and substantially disrupt the work and discipline of the school." *Id.* at 513. Because schools have a responsibility for "teaching students the boundaries of socially appropriate behavior," *Fraser*, 478 U.S. at 681, offensive speech that would receive full constitutional protection if used by an adult in public discourse may, consistent with the First Amendment, give rise to disciplinary action by a school, *id.* at 682. Additionally, educators are permitted to exercise editorial control over "school-sponsored expressive activities such as school publications or theatrical productions," *Doninger II*, 527 F.3d at 48, so long as their actions are "reasonably related to legitimate pedagogical concerns," *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988). Finally, and most recently, the Supreme Court has determined that public schools may "take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use," *Morse v. Frederick*, 551 U.S. 393, 397 (2007), because of the special nature of the school environment and the dangers posed by student drug use, *id.* at 408.

Our analysis of the two First Amendment claims at issue in this case is further guided by the doctrine of qualified immunity. In deciding whether to grant a government official's motion for

summary judgment on qualified immunity grounds, a court conducts a two-part inquiry. The court asks whether "the facts, viewed in the light most favorable to the plaintiff, show that the [official's] conduct violated a constitutional right." *Gilles v. Repicky*, 511 F.3d 239, 244 (2d Cir. 2007) (quoting *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007)); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001), *abrogated on other grounds by Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009). "[I]f the plaintiff has satisfied th[at part], the court must decide whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Pearson*, 129 S. Ct. at 816; *see also Gilles*, 511 F.3d at 243. "If the conduct did not violate a clearly established constitutional right, or if it was objectively reasonable for the [official] to believe that his conduct did not violate such a right, then the [official] is protected by qualified immunity." *Gilles*, 511 F.3d at 244; *see also DeFabio v. E. Hampton Union Free Sch. Dist.*, 623 F.3d 71, 77 (2d Cir. 2010). Until recently, courts were required to perform the two-part qualified immunity inquiry in order, first asking whether the defendant violated a constitutional right and, if it was determined that a right was violated, only then asking whether that right was "clearly established." *See Saucier*, 533 U.S. at 201. Following the Supreme Court's decision in *Pearson v. Callahan*, however, we may now exercise our discretion in deciding the order in which to conduct the qualified immunity analysis. 129 S. Ct. at 821.

In determining if a right is clearly established, this Court looks to whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful. *Young v. Cnty. of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998). "The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in [the] defendant's

position should know about the constitutionality of the conduct." *Id.* Moreover, when faced with a qualified immunity defense, a court should consider the specific scope and nature of a defendant's qualified immunity claim. That is, a determination of whether the right at issue was "clearly established" "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. Thus, the qualified immunity analysis must be "'particularized'" in the sense that "'[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.'" *Zieper v. Metzinger*, 474 F.3d 60, 68 (2d Cir. 2007) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Pena v. DePrisco*, 432 F.3d 98, 114-15 (2d Cir. 2005).

**A.      Discipline for the Blog Post**

We begin with Doninger's claim that her First Amendment rights were violated when Niehoff prohibited her from running for Senior Class Secretary in response to Doninger's blog post. Citing *Fraser,* the district court concluded that "Doninger's First Amendment rights were not violated when she was told that she could not run for class secretary because of an offensive blog entry that was clearly designed to come on to campus and influence fellow students." *Doninger III*, 594 F. Supp. 2d at 221. Alternatively, the court determined in its qualified immunity analysis that any First Amendment right claimed by Doninger "not to be prohibited from participating in a voluntary, extracurricular activity because of offensive off-campus speech when it was reasonably foreseeable that the speech would come on to campus and thus come to the attention of school authorities" was not clearly established. *Id.* at 222.

We do not reach the question whether school officials violated Doninger's First Amendment rights by preventing her from running for Senior Class Secretary. We see no need to decide this question. We agree with the district court that any First Amendment right allegedly violated here was not clearly established, such that "it would [have been] clear to a reasonable [school official] that [her] conduct was unlawful in the situation [she] confronted." *Saucier*, 533 U.S. at 202. Accordingly, Defendants were properly afforded qualified immunity as to this claim.

Doninger's principal argument to the contrary is that under Supreme Court precedent and this Court's decision in *Thomas v. Board of Education*, 607 F.2d 1043 (2d Cir. 1979), "it *was* clearly established at the time [of the events in this case] that off campus speech could not be the subject of school discipline," Plaintiff-Appellee-Cross-Appellant Reply Br. at 12 (emphasis added). But as we explained in *Doninger II*, the "Supreme Court has yet to speak on the scope of a school's authority to regulate expression that, like Avery's, does not occur on school grounds or at a school-sponsored event." 527 F.3d at 48. It is thus incorrect to urge, as Doninger does, that Supreme Court precedent necessarily insulates students from discipline for speech-related activity occurring away from school property, no matter its relation to school affairs or its likelihood of having effects — even substantial and disruptive effects — in school.

This Court's 1979 decision in *Thomas* similarly fails to establish that off-campus speech may never properly be disciplined. In *Thomas*, public school students were punished for publishing and distributing to their peers a lewd, satirical newspaper. 607 F.2d at 1045-46. The production, publication, and distribution of the paper occurred almost entirely off campus, although some copies eventually found their way to school grounds and drew the attention of school officials. *Id.* This Court concluded that because the students' activities were deliberately designed to take place away

17

from school, such that "any activity within the school itself was *de minimis*," the school, in punishing them, had "ventured out of the school yard and into the general community," and the punishment imposed could not "withstand the proscription of the First Amendment." *Id.* at 1050. The *Thomas* Court noted, however, that it could "envision a case in which a group of students incites substantial disruption within the school from some remote locale," suggesting that such behavior, simply not present in the case before it, might appropriately be disciplined. *Id.* at 1052 n.17. Judge Newman, moreover, concurring in the result in *Thomas*, explicitly noted that "[s]chool authorities ought to be accorded some latitude to regulate student activity that affects matters of legitimate concern to the school community, and territoriality is not necessarily a useful concept in determining the limit of their authority." *Id.* at 1058 n.13 (Newman, *J.*, concurring).

It is therefore not the case that, in this Circuit, *Thomas* clearly established that off-campus speech-related conduct may never be the basis for discipline by school officials. Indeed, this Court expressly held that it *could* in *Wisniewski v. Board of Education*, 494 F.3d 34 (2d Cir. 2007), a case decided only a few months after the events in question here. In *Wisniewski*, a public school student used an instant messaging ("IM") program to communicate with fellow students from his home computer. For a three-week period, whenever he sent an IM, the message was accompanied by a crudely drawn icon depicting one of his teachers being shot in the head, with text below reading "Kill Mr. VanderMolen." *Id.* at 35-36. When the icon came to the attention of school officials, it caused a disturbance, leading to a criminal investigation and also requiring the special attention of school officials, the replacement of VanderMolen (who asked to be relieved of teaching the student's class), and interviews of pupils during class time. *Id.* at 35. Citing *Tinker* and *Thomas*, we determined that "[t]he fact that [the] creation and transmission of the IM icon occurred away from

18

school property does not necessarily insulate [the student] from school discipline." *Id*. at 39. Where the icon's off-campus display "pose[d] a reasonably foreseeable risk that [it] would come to the attention of school authorities and . . . 'materially and substantially disrupt the work and discipline of the school,'" the student's suspension for this display did not run afoul of the First Amendment. *See id.* at 38-39 (quoting *Morse*, 551 U.S. at 403).

Doninger next contends that even if off-campus expression may in some circumstances be regulated by school officials, any reasonable school administrator would know that such regulation is permissible *only* when speech-related activity satisfies the so-called *Tinker* test employed in *Wisniewski* — i.e., when it poses a reasonably foreseeable risk of coming to the attention of school authorities and materially and substantially disrupting the work and discipline of the school. *See id.* at 38-39 (applying *Tinker* standard to off-campus speech). Doninger urges that no reasonable school administrator could have deemed that standard satisfied here or, at a minimum, that disputed issues of material fact exist as to the reasonableness of any such conclusion. We disagree with all these propositions.

At the start, it would gravely distort the doctrine of qualified immunity to hold that a school official should "fairly be said to 'know' that the law forb[ids] conduct not previously identified as unlawful." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Doninger has identified no case — and we are aware of none — that enunciates her supposedly bright-line principle strictly limiting the regulation of off-campus speech to *Tinker*-style circumstances or otherwise demonstrating a clearly established rule applicable to the specific circumstances of this case. *See Gilles*, 511 F.3d at 244 (noting that "[t]he inquiry into whether a right at issue was clearly established is tied to the specific facts and context of the case"). Indeed, in the previous iteration of this case before this Court, we

19

specifically noted that the applicability of *Fraser* to plainly offensive off-campus student speech is uncertain, *Doninger II*, 527 F.3d at 49-50, reinforcing the absence of a clearly established right under the circumstances of this case.

To the extent Doninger concedes that courts have upheld as consistent with First Amendment principles the regulation of off-campus expression satisfying the *Tinker* standard, moreover, *Tinker* itself provides "substantial grounds" for the School officials here "to have concluded [they] had legitimate justification under the law for acting as [they] did." *Saucier*, 533 U.S. at 208. The undisputed facts — that Doninger's blog post directly pertained to an event at LMHS, that it invited other students to read and respond to it by contacting school officials, that students did in fact post comments on the post, and that school administrators eventually became aware of it — demonstrate that it was reasonably foreseeable that Doninger's post would reach school property and have disruptive consequences there. *See Doninger II*, 527 F.3d at 50; *Wisniewski*, 494 F.3d at 39-40. In *Doninger II*, we relied primarily on two additional facts to conclude that Doninger's blog post portended foreseeable disruption to the school's work and discipline: namely, (1) that the language Doninger employed (asking others to call the "douchebags" in the central office to "piss [them] off more") was "potentially disruptive of efforts to resolve the ongoing controversy," 527 F.3d at 50-51; and (2) that in the midst of this controversy, Doninger's blog post conveyed the "'at best misleading and at wors[t] false' information that Jamfest had been cancelled in [Doninger's] effort to solicit more calls and emails to Schwartz," *id.* at 51 (first alteration in original) (quoting *Doninger I*, 514 F. Supp. 2d at 202).

Doninger argues that in light of further development of the record since *Doninger II* and the procedural posture of our review of a grant of summary judgment, disputed issues of fact now exist

as to the reasonableness of any conclusion that her post was potentially disruptive. We agree with Doninger that, when the record is viewed in the light most favorable to her, it no longer supports the conclusion that on April 24 Niehoff informed Doninger both that her behavior was inappropriate for a class officer and that the students' mass email contained inaccurate information (because Niehoff was amenable to rescheduling Jamfest so it could be held in the auditorium). There similarly exists a factual dispute as to whether Niehoff obtained Doninger's word that the email would be corrected, only subsequently to learn that Doninger republished it that very night, and as to whether Doninger's blog post, claiming that Jamfest had been cancelled, was in fact false.[9]

Even taking the facts presented in the record in the light most favorable to Doninger, however, there remains no triable issue here as to whether it was objectively reasonable for school administrators to conclude that Doninger's posting was potentially disruptive to the degree required by *Tinker*. According to the *undisputed* facts in this case, the controversy over Jamfest's scheduling had already resulted in a deluge of phone calls and emails, several disrupted schedules, and many upset students even before Doninger posted her comments on livejournal.com. This disruption continued the next day, as calls poured in for both Principal Niehoff and Superintendent Schwartz, a group of upset students gathered outside Niehoff's office, and Doninger and three other students were called out of class to meet with Schwartz, Niehoff, Hill, Miller, and Fortin (themselves pulled away from other duties) in an effort to resolve the controversy. Perhaps a school official in these circumstances might err in concluding that Doninger's blog post — disseminated amidst circulating

[9] The district court credited Niehoff's testimony regarding her April 24 conversation with Doninger in ruling on Doninger's motion for a preliminary injunction, *see Doninger II*, 527 F.3d at 45, but Doninger's recollection of that conversation is different and must now be assumed to be true in reviewing a grant of summary judgment against her on her blog-post-related claim.

21

rumors that Jamfest had been arbitrarily cancelled, calling the responsible school administrators "douchebags," and urging fellow students to take action to "piss [them] off more" — was of the sort to stoke disruption and frustrate the School's ongoing efforts at conflict resolution. *See Doninger II*, 527 F.3d at 51 (noting that "[t]he question is not whether there has been actual disruption, but whether school officials 'might reasonably portend disruption' from the student expression at issue" (quoting *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 989 (9th Cir. 2001))). But even viewing the evidence in the light most favorable to Doninger, there is simply nothing in the record creating a disputed issue of fact as to the *objective reasonableness* of any such judgment. *See Lennon v. Miller*, 66 F.3d 416, 420-21 (2d Cir. 1995) ("An [official's] actions are objectively unreasonable when no [official] of reasonable competence could have made the same choice in similar circumstances. Thus, if the court determines that the only conclusion a rational jury could reach is that reasonable [officials] would disagree about the legality of the defendants' conduct under the circumstances, summary judgement for the [officials] is appropriate." (citation omitted)). And *this* is the concern of qualified immunity doctrine. *See Gilles*, 511 F.3d at 244.

Doninger urges in reply that there *is* a disputed issue of fact as to whether Niehoff disciplined her because her posting was potentially disruptive, or simply because it was offensive, and that *this* factual dispute renders the district court's grant of summary judgment erroneous. Indeed, it was on this basis that the district court concluded that it could not grant summary judgment solely on the basis of a *Tinker* analysis of the disruptive potential of Doninger's speech. *See Doninger III*, 594 F. Supp. 2d at 219-20. Even assuming the existence of such a factual dispute, however, the Supreme Court has stated that "a defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was . . . improperly motivated." *Crawford-El v. Britton*, 523 U.S. 574, 588

(1998). Evidence of subjective intent "is simply irrelevant to [this] defense." *Id.* Granted, this rule does not apply when intent is an element of a First Amendment claim or defense "*as defined by clearly established law*" and a factual dispute as to intent precludes the conclusion that a government official's conduct was objectively reasonable. *Locurto v. Safir*, 264 F.3d 154, 169 (2d Cir. 2001) (emphasis added). But such is not the case here.

The district court concluded that under *Tinker* a defendant must show "not only a potential for disruption, but also that 'the concern for disruption, rather than some other, impermissible motive, was the actual reason for' the punishment imposed." *Doninger III*, 594 F. Supp. 2d at 219 (quoting *Locurto v. Giuliani*, 447 F.3d 159, 180 (2d Cir. 2006)). In so ruling, however, it relied not on our school speech cases but rather on our case law addressing the different context of alleged retaliation against government employees for the exercise of First Amendment rights. In that setting, retaliatory intent is a necessary element of the First Amendment claim. *See Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir. 2003). Moreover, it is an established element of the so-called *Pickering* balancing test defense that a government official establish that an adverse employment action was taken "not in retaliation for the employee's speech, but because of [a] potential for disruption." *Id.* at 114.

In contrast, the Supreme Court in *Tinker* did not clearly establish intent as an element of any claim or defense, nor has our case law pursuant to *Tinker*. As a result, even assuming a factual dispute exists as to Niehoff's motivation, qualified immunity is still proper where Defendants were objectively reasonable in their judgment that they "might reasonably portend disruption from the student expression at issue." *Doninger II*, 527 F.3d at 51 (internal quotation marks omitted). Moreover, even if this were *not* the case — even if intent constituted a clearly established element

of a *Tinker* defense — the supposed factual dispute as to whether Niehoff was motivated by the offensiveness of Doninger's speech or by its disruptive potential would still not matter here. As the district court recognized, it was also not clearly established at the time of these events that Doninger had any First Amendment right not to be prohibited from running for Senior Class Secretary because of *offensive* off-campus speech, at least when such speech pertained to a school event, invited students to read and respond to it by contacting school administrators, and it was reasonably foreseeable "that the speech would come on to campus and thus come to the attention of school authorities." *Doninger III*, 594 F. Supp. 2d. at 222.

Finally, our conclusion that whatever right Doninger may have had was not clearly established is buttressed by the similarities between this case and the Sixth Circuit's decision in *Lowery v. Euverard*, 497 F.3d 584 (6th Cir. 2007), decided only shortly after the events at issue here. In *Lowery*, a group of high school football players signed a petition expressing their hatred of the coach and their desire not to play for him. When the coach became aware of this activity, he dismissed those players who refused to apologize from the team. *Id.* at 585-86. The Sixth Circuit, conducting an analysis under *Tinker*, concluded that the school did not violate the players' First Amendment rights by deeming them unfit to serve on the football team so long as they were actively working to undermine the coach. *Id.* at 587-96. In determining that the students' First Amendment rights had not been violated, the Sixth Circuit noted that "Plaintiffs' regular education has not been impeded, and, significantly, they are free to continue their campaign to have [the coach] fired. What they are not free to do is continue to play football for him while actively working to undermine his authority." *Id.* at 600 (emphasis omitted).

Similarly, Doninger's discipline extended only to her role as a student government

24

representative: she was not suspended from classes or punished in any other way. Given that Doninger, in serving in such a position, was to help maintain a "continuous communication channel from students to both faculty and administration," it was not unreasonable for Niehoff to conclude that Doninger, by posting an incendiary blog post in the midst of an ongoing school controversy, had demonstrated her unwillingness properly to carry out this role. To be clear, we do not conclude in any way that school administrators are immune from First Amendment scrutiny when they react to student speech by limiting students' participation in extracurricular activities. Here, however, pursuant to *Tinker* and its progeny, it was objectively reasonable for school officials to conclude that Doninger's behavior was potentially disruptive of student government functions (such as the organization of Jamfest) and that Doninger was not free to engage in such behavior while serving as a class representative — a representative charged with working with these very same school officials to carry out her responsibilities.

Qualified immunity "balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 129 S. Ct. at 815. Under the qualified immunity doctrine, government officials such as the school administrators here "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. They are entitled to the protection of qualified immunity unless the unlawfulness of their actions was apparent in light of preexisting law. *See Anderson*, 483 U.S. at 639-40. There was no such apparent unlawfulness here. Instead, it was objectively reasonable for Niehoff and Schwartz to believe they could prohibit Doninger from running for Senior Class

25

Secretary without violating her First Amendment rights, given the "specific facts and context of the case." *Gilles*, 511 F.3d at 244. We thus conclude that Niehoff and Schwartz were properly afforded qualified immunity as to Doninger's blog post claim.

**B.      The T-Shirt Controversy**

We turn next to Defendants' argument that the district court erred in denying them qualified immunity on Doninger's claim that they violated her First Amendment rights when they prohibited her from displaying a "Team Avery" t-shirt in the election assembly. Applying *Tinker* and viewing the facts in the light most favorable to Doninger, the district court concluded: (1) that a reasonable jury could find that permitting students to wear the t-shirts into the assembly would not have materially and substantially interfered with the election process; and (2) that Doninger's right to display her t-shirt in the auditorium *was* clearly established. *See Doninger III*, 594 F. Supp. 2d at 225-27. We agree that a reasonable fact-finder could conclude that Defendants were mistaken in assessing the likely impact of the t-shirts and thus the permissibility of prohibiting them pursuant to *Tinker*. At the same time, however, we conclude that any such mistake was reasonable. Accordingly, Defendants are entitled to qualified immunity on this claim as well.[10]

**i.      Jurisdiction to Review the Denial of Qualified Immunity on the "T-Shirt" Claim**

We address a preliminary matter at the start. Doninger argues that we do not have jurisdiction over the district court's denial of qualified immunity as to the so-called "t-shirt" claim. Generally, "a district court's denial of a claim of qualified immunity, to the extent that it turns on

---

[10] We note that Defendants rely not only on *Tinker* to assert qualified immunity as to this claim, but also on the argument that the t-shirts were prohibited as part of a general, viewpoint-neutral restriction on electioneering materials at the school assembly. Because we conclude that Defendants are entitled to qualified immunity on the ground that their actions, even if mistaken, were objectively reasonable in light of *Tinker,* we do not consider this argument.

an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Tierney v. Davidson*, 133 F.3d 189, 194 (2d Cir. 1998) (internal quotation marks omitted) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)). We do not, however, have jurisdiction to review a denial of qualified immunity to the extent it is based on a district court's finding that there is enough evidence in the record to create a genuine issue as to factual questions that are, in fact, material to resolution of the qualified immunity claim. *Salim v. Proulx*, 93 F.3d 86, 89-90 (2d Cir. 1996) (citing *Johnson v. Jones*, 515 U.S. 304 (1995), and *Behrens v. Pelletier*, 516 U.S. 299 (1996)).

Here, we may exercise interlocutory jurisdiction to determine whether, assuming Doninger's version of the facts is true, Defendants are entitled to qualified immunity as a matter of law. *Tierney*, 133 F.3d at 194. To the extent we base our decision on undisputed facts and Doninger's version of any material disputed facts, we have jurisdiction to consider whether, as a matter of law, the district court erred in determining that this case is sufficiently like *Tinker* so that school officials of reasonable competence could not disagree that the actions taken here, in their particular factual context, were illegal.[11] *See Malley v. Briggs*, 475 U.S. 335, 341 (1986); *see also Anderson*, 483 U.S. at 638 (noting that qualified immunity shields government officials from liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated").

---

[11] We note that Doninger again argues that a factual dispute regarding Niehoff's motive, which Doninger urges was "to quash speech supporting her" rather than to avoid disruption, precludes the grant of qualified immunity. As we have already stated, however, our case law has not clearly established motive as an element of any *Tinker*-related claim or defense. As a result, any factual dispute as to Niehoff's motive does not preclude the conclusion that Niehoff's conduct was objectively reasonable and entitled to qualified immunity. *See Crawford-El*, 523 U.S. at 588.

### ii.    Defendants' Entitlement to Qualified Immunity

We turn now to the merits of Defendants' qualified immunity claim. Unlike the blog post, the t-shirts at issue in this case constituted student speech on, not beyond, school grounds. The t-shirts were not vulgar, *see Fraser*, 478 U.S. at 683, did not promote drug use, *see Morse*, 551 U.S. at 409, and were not student speech that could reasonably be perceived to "bear the imprimatur of the school," *Hazelwood*, 484 U.S. at 271. Defendants assert that the t-shirts were banned to prevent two kinds of disruption to school activities: (1) vocal outbursts or other disruptions in the assembly to which the students were reporting; and (2) a possible write-in campaign to elect Doninger as Senior Class Secretary even though she had been removed from the ballot.

We note that the district court, in denying Defendants' motion for reconsideration, asserted that Defendants failed to make these arguments in their motion for summary judgment, although the court nonetheless proceeded to consider their merits. *See Doninger*, 2009 WL 763492, at \*1-\*2. Our review of the parties' submissions on summary judgment, however, demonstrates that Defendants sufficiently highlighted the indicia of disruption in the record so as to preserve the claim that they acted in an objectively reasonable manner pursuant to *Tinker*. At oral argument on the summary judgment motion, Defendants' counsel urged that there was a risk of disruption arising from the prospect that students might drown out the candidates' speeches during the election assembly with cheers of support for Doninger. In counsel's words, "What if . . . the principal says, quiet everybody and they say no and then the T-shirts come out . . . that's absolutely disruptive." Oral Argument Tr. at 80:7-14. We conclude that Defendants' arguments regarding both (1) the threatened disruption of the election assembly and (2) the possibility of a write-in campaign were raised with "sufficient particularity" so as to be preserved. *See McCardle v. Haddad*, 131 F.3d 43,

51 (2d Cir. 1997). Indeed, Doninger does not argue to the contrary. Because we conclude that the threat of disruption to the school assembly alone provided school officials with "substantial grounds" for their actions, however, such that "[i]t cannot be said there was a clearly established rule" as to the illegality of their conduct, *see Saucier*, 533 U.S. at 208-09, we need address only the first of Defendants' arguments.

We again focus on the second prong of the qualified immunity inquiry — whether, assuming that Doninger had a First Amendment right to wear her t-shirt at the assembly, this right was clearly established. *Cf. Pearson*, 129 S. Ct. at 818-19. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. If "'[officials] of reasonable competence could disagree' on the legality of the action at issue in its particular factual context," then the defendant is entitled to qualified immunity, "[e]ven if the right at issue was clearly established in certain respects." *Walczyk*, 496 F.3d at 154 (quoting *Malley*, 475 U.S. at 341). Qualified immunity analysis, moreover, is "objective" rather than "subjective." *See, e.g., Anderson*, 483 U.S. at 641. Thus, qualified immunity protects government officials when they make "reasonable mistakes" about the legality of their actions, *Saucier*, 533 U.S. at 206, and "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact," *Pearson*, 129 S. Ct. at 815 (internal quotation marks omitted). "In this respect, the Supreme Court has observed that qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Walczyk*, 496 F.3d at 154 (quoting *Malley*, 475 U.S. at 341); *see also Saucier*, 533 U.S. at 202.

The law governing restrictions on student speech can be difficult and confusing, even for

lawyers, law professors, and judges. The relevant Supreme Court cases can be hard to reconcile, and courts often struggle to determine which standard applies in any particular case. *See, e.g.*, *Morse*, 551 U.S. at 430 (Breyer, *J.*, concurring in the judgment in part and dissenting in part) (noting that the law regarding student speech is often unclear, with various courts describing the governing standards as "complex and often difficult to apply"). We conclude, for instance, that *Tinker* governs here — that because the t-shirts were not vulgar, *see Fraser*, 478 U.S. at 683, could not reasonably be perceived to bear the School's imprimatur, *see Hazelwood*, 484 U.S. at 271, and did not encourage drug use, *see Morse*, 551 U.S. at 409, they could be subject to regulation different from that permissible for adults in non-school settings only if they threatened substantial disruption to the work and discipline of the School. But as we have suggested in the past, it is not entirely clear whether *Tinker*'s rule (as opposed to other potential standards) applies to all student speech not falling within the holdings of *Fraser*, *Hazelwood*, or *Morse*. *See Guiles ex rel. Guiles v. Marineau*, 461 F.3d 320, 326 (2d Cir. 2006); *see also Morse*, 551 U.S. at 405 ("*Fraser* established that the mode of analysis set forth in *Tinker* is not absolute."). In *Morse*, the Supreme Court's most recent pronouncement on student speech, the Court noted that "the rule of *Tinker* is not the only basis for restricting student speech." *Id.* at 406. Granted, two Justices who helped constitute the *Morse* majority joined only on the understanding that *Morse* does not hold that the special characteristics of schools *necessarily* justify any additional speech restrictions. *Id.* at 423 (Alito, J., concurring). But this qualification does not rule out the possibility that some such hitherto unrecognized grounds of regulation may exist.

To be clear, we neither recognize any such grounds, nor express a view as to their desirability. As the Supreme Court stated in *Tinker*, "[t]he Nation's future depends upon leaders

trained through wide exposure to [the] robust exchange of ideas," and students "may not be confined to the expression of those sentiments that are officially approved." 393 U.S. at 511-12.

That said, a reasonable school official could well note salient differences between the circumstances here and those in *Tinker*. In *Tinker*, school officials prohibited high school students from wearing black armbands to school in protest of the Vietnam War. They sought to punish with suspension individual students who engaged in "a silent, passive expression" of dissenting political opinion in circumstances in which the rights of other students were not implicated and the wearing of the armbands "was entirely divorced from . . . [even] potentially disruptive conduct." *Id*. at 505, 508. Here, in contrast, some undetermined number of students, agitated by the actions of school officials, wished jointly to affirm support for a student they believed had been improperly disciplined by being prohibited from running for class office. They wished to do so specifically in the context of a school election assembly at which the candidates for various offices, also students, were scheduled to speak. In light of these significant differences in the two scenarios (not the least of which involves the interests of other students), an official in Defendants' position who thought that a less demanding standard of potential disruption might apply could not be said to have an unreasonable understanding of what the law requires. *See Malley*, 475 U.S. at 341 (stating that qualified immunity is designed to protect "all but the plainly incompetent or those who knowingly violate the law"). And as the Supreme Court has repeatedly affirmed, "[i]f the [official's] mistake as to what the law requires is reasonable . . . [she] is entitled to the immunity defense." *Saucier*, 533 U.S. at 205.

Further, even assuming, *arguendo*, that it would be clear to a reasonable official that the *Tinker* standard applied in the circumstances presented, Defendants are still entitled to qualified

31

immunity if such an official could have reasonably erred in determining whether the potential for disruption at the assembly was sufficient to satisfy that standard. Even viewing the evidence in the light most favorable to Doninger, we conclude that such is the case here.

To be clear, to prohibit student speech on the ground that it will result in disruption, "administrators . . . must be able to show that [their] action 'was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.'" *DeFabio*, 623 F.3d at 78 (quoting *Tinker*, 393 U.S. at 508). As we explained the standard in our review of the district court's order denying a preliminary injunction in this case, "[t]he question is . . . whether school officials 'might reasonably portend disruption' from the student expression at issue." *Doninger II*, 527 F.3d at 51 (quoting *LaVine*, 257 F.3d at 989). The line between the potential for "substantial disruption of or material interference with school activities," *Tinker*, 393 U.S. at 514, however, and the potential for less significant interference is similar to the "hazy border" that the Supreme Court has recognized to exist between acceptable and excessive uses of force. *See Saucier*, 533 U.S. at 206 (quoting *Priester v. Riviera Beach*, 208 F.3d 919, 926-927 (11th Cir. 2000)). The Court has made clear that qualified immunity operates to protect officials in such areas of indeterminacy and "to ensure that before they are subjected to suit, [they] are on notice their conduct is unlawful." *Id.*

According to the undisputed facts in this case, Doninger and her supporters were clearly upset about the decision to remove her from the ballot, and were eager to speak out publicly concerning their views. Doninger had appeared on a local news show with her mother to talk about her blog posting and her resulting punishment. She attempted to discuss the news interview in class on the day preceding the election assembly, provoking another student to shout out apparent support

32

in sufficiently disruptive terms that the student was sent to Niehoff's office. By at least the early morning hours of the day of the election, Niehoff was aware of a plan by students specifically to bring t-shirts supportive of Doninger into an election assembly at which other students, including the two candidates for Senior Class Secretary, were scheduled to speak. Niehoff may not have known with certainty that permitting the t-shirts into the assembly would cause students to disrupt those speeches. But she could not responsibly have ignored the fact that Doninger herself, in her blog post of the previous month, had already demonstrated some willingness to incite confrontation with school officials. And we note further that Niehoff's concern about the potential disruption of the assembly was partially borne out even in the absence of the t-shirts, when students shouted "Vote for Avery" and had to be warned to be respectful.

"School principals," as the Supreme Court has recently noted, "have a difficult job." *Morse*, 551 U.S. at 409. Given Niehoff's responsibility for ensuring an orderly election process, enforcing the punishment against Doninger, and safeguarding the interests of those students who were to speak at the assembly, she faced a difficult task in assessing whether the threat of disruption was severe enough to justify preventing Doninger from wearing her t-shirt into the assembly. A reasonable jury could find that a school official who believed the threatened disruption here was sufficiently substantial was, under the circumstances, mistaken. We cannot conclude, however, that such a mistake was anything but reasonable – the very sort of mistake for which the qualified immunity doctrine exists to shield officials against unwarranted liability.

"The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made[.]" *Saucier*, 533 U.S. at 205. To be clear, the need to make difficult choices cannot protect principals or other school officials when they make *unreasonable* judgments regarding the legality

33

of their actions. "In our system, state-operated schools may not be enclaves of totalitarianism. School officials do not possess absolute authority over their students." *Tinker*, 393 U.S. at 511. But the record here does not suggest, much less show, the Lewis S. Mills High School to be anything remotely resembling an "enclave[] of totalitarianism," or that the defendant school officials acted in a way that suggested a claim to "absolute authority over their students." We conclude that, in the circumstances here, reasonable school officials could disagree about the potential for a substantial disruption of the assembly as a result of permitting students to wear the t-shirts inside. Accordingly, Defendants are entitled to qualified immunity.

### C. *Monell* Liability

In addition to her claims against Defendants in their individual capacities, Doninger asserts on appeal that she also brought a claim under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), for money damages against them in their official capacities, based on a "final policymaker" theory of municipal liability. *See Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000). The district court rejected this claim, first raised in Plaintiff's motion for reconsideration at the summary judgment stage, for a number of reasons, including: (1) the express statement by Plaintiff's counsel at an earlier stage that the sole action being brought against Defendants in their official capacities was for injunctive relief and, to the extent this statement was in error, counsel's tardiness in correcting it; (2) Plaintiff's failure to mention a *Monell* claim throughout briefing and oral argument on the parties' summary judgment motions; and (3) to the extent Doninger relied on her second amended complaint to put Defendants on notice of her supposed *Monell* claim, that this pleading was insufficient to provide such notice and was, in any event, filed several months after Defendants' motion for summary judgment and permitted solely for the limited purpose of substituting Avery

34

Doninger as a party in place of her mother. *Doninger*, 2009 WL 763492, at \*4-\*5.

Plaintiff argues on appeal that Defendants were on notice of her alleged *Monell* claim based on the fact that her second amended complaint referred to a suit against Defendants in their individual and official capacities and because the burden was on Defendants to obtain clarification of what claims were being asserted at the time they moved for summary judgment. We disagree. Plaintiff's counsel unequivocally declared at a deposition conducted on February 25, 2008, that the only claim being brought against Defendants in their official capacities was one for injunctive relief. The second amended complaint, moreover, was permitted solely to substitute Avery Doninger as a plaintiff in place of her mother. *See Doninger*, 2009 WL 763492, at \*5; *cf. Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir. 2007) (noting that the factual allegations in a complaint must be sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests"). Although Plaintiff finally raised the question of municipal liability in her motion for reconsideration, albeit without specifying on what basis she was claiming this liability existed, Defendants were nevertheless not on notice of any *Monell* claim at the time they filed their motion for summary judgment, nor did the filing of the second amended complaint put them on such notice given the limited purpose for which it was allowed. As a result, the district court's grant of summary judgment to them on the blog post claim was not in error.

To the extent Plaintiff's motion for reconsideration might be viewed as an attempt to amend the complaint to add a *Monell* claim, the district court — which stated that it was "inclined to believe either that counsel intentionally hid the ball in the hope of sneaking past summary judgment unchallenged or that he never even thought of pressing a *Monell* claim against the school district until the Court issued its decision granting summary judgment on the blog entry claim," *Doninger*,

35

2009 WL 763492, at *4 — did not abuse its discretion in refusing permission to add a claim at that late stage, *see Holmes v. Grubman*, 568 F.3d 329, 334 (2d Cir. 2009) ("Generally, '[a] district court has discretion to deny leave [to amend a complaint] for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.'" (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007))). Thus, the district court did not err in finding that Plaintiff had not properly asserted a *Monell* claim against the school district.

**II.    Other Claims**

Finally, in addition to her First Amendment claims, Doninger also argues on appeal that the district court erred in granting summary judgment to Defendants on her Equal Protection claim and dismissing *sua sponte* her claims under the Connecticut Constitution. *See Doninger III*, 594 F. Supp. 2d at 227-29. With regard to her Equal Protection claim, Doninger purports to make a "selective enforcement" argument pursuant to *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980), on the theory that she was treated differently from the other Student Council officers who sent the mass email, based on her exercise of First Amendment rights. In order to succeed on a selective enforcement theory, Doninger must show both "(1) that [she was] treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (internal quotation marks omitted). Here, it is undisputed that Doninger was disqualified for running for Senior Class Secretary because of her April 24 posting on livejournal.com. She has not shown that any other Student Council member went unpunished after engaging in similarly offensive speech in circumstances that were potentially

disruptive to resolution of an ongoing dispute between students and the School's administration. We therefore affirm the district court's grant of summary judgment in favor of Defendants on Doninger's Equal Protection claim.

We similarly affirm the judgment of the district court dismissing Doninger's claims based on the Connecticut Constitution. We agree with the district court that Doninger has failed to "identif[y] a single Connecticut decision that suggests that free speech protections for public school students are broader under the Connecticut Constitution than under the U.S. Constitution." *Doninger III*, 594 F. Supp. 2d at 228. In any event, the dismissal was without prejudice. The decision not to exercise supplemental jurisdiction was not an abuse of discretion.

**CONCLUSION**

We have considered all of Doninger's contentions on appeal and have found them to be without merit. For the foregoing reasons, the judgment of the district court is **AFFIRMED IN PART** and **REVERSED IN PART**: This matter is remanded for the district court to enter judgment for Defendants. The dismissal of Doninger's state claims without prejudice is **AFFIRMED**.

37