11-1198-cv (L)
Sudler v. City of New York

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

August Term 2011

(Argued: March 13, 2012      Decided: August 7, 2012)

Docket Nos. 11-1198-cv(L), 11-1216-cv(con)

TERENCE SUDLER, TIMOTHY BATTHANY,

*Plaintiffs-Appellants,*

-v-

CITY OF NEW YORK, MARTIN F. HORN, OF THE NEW YORK CITY
DEPARTMENT OF CORRECTIONS (NYCDOC), WARDEN, WHO WAS IN
CHARGE OF PLAINTIFF'S CORRECTIONAL FACILITY AT RIKERS ISLAND,
GLENN S. GOORD, FORMER COMMISSIONER OF THE NEW YORK STATE
DEPARTMENT OF CORRECTIONAL SERVICES (DOCS), ANTHONY ANNUCCI,
DEPUTY COMMISSIONER AND COUNSEL FOR DEPARTMENT OF
CORRECTIONAL SERVICES, RALPH W. SANTOR, OF CHATEAUGAY
A.S.A.C.T.C., BONNIE S. LaCLAIR, INMATE RECORDS COORDINATOR I AT
CHATEAUGAY A.S.A.C.T.C., MICHAEL MOES, EMPLOYEES OF DEPARTMENT
OF CORRECTIONAL SERVICES, PAUL POES, SUPERVISORY EMPLOYEES OF
THE DEPARTMENT OF CORRECTIONAL SERVICES, ROBERT J. DENNISON,
FORMER CHAIRMAN AND CHIEF EXECUTIVE OFFICER OF NEW YORK STATE
DIVISION OF PAROLE, JARVIS JENKINS, RIKERS ISLAND SENIOR PAROLE
OFFICER, SHIELD NO. 408, RUBEN HERNANDEZ, RIKERS ISLAND PAROLE
OFFICER, SHIELD NO. 190, PEMBERTON, PAROLE OFFICER, RIKERS ISLAND,
BILLIE BOE, NEW YORK STATE DIVISION OF PAROLE EMPLOYEES AT
CHATEAGAY A.S.A.C.T.C. WHO WAS RESPONSIBLE FOR THE PROPER
CALCULATION OF PLAINTIFF'S TIME, BILLIE BOES, EMPLOYEES OF THE NYS
DVISION OF PAROLE, LARRY LOES, SUPERVISORY EMPLOYEES OF THE NEW
YORK STATE DIVISION OF PAROLE, LUCIENTE J. LeCLAIRE, JR.,

SUPERINTENDENT OF ULSTER CORRECTIONAL FACILITY FROM DECEMBER 2005 TO JULY 2006, DONNA DIETZ, INMATE RECORDS COORDINATOR I AT ULSTER CORRECTIONAL FACILITY FROM DECEMBER 2005 TO JULY 2006, LINDA E. STEVENS, AT ULSTER CORRECTIONAL FACILITY WHO WROTE MEMORANDA TO PLAINTIFF ON DECEMBER 29, 2005 AND JANUARY 4, 2006, LARRY LOE, NEW YORK STATE DIVISION OF PAROLE SUPERVISOR OF LINDA E. STEVENS, JULIE TRAVIS, KENNETH WHITE, ROBERT FALL, ROGER WATTERS, DONNA BLEICHERT, DANIEL AMEND, FRANCINE E. SMITH, SENTENCING REVIEW SPECIALIST, TAMI J. HUGHES, NYS DIVISION OF PAROLE AGENCY PROGRAM AIDE IN ALBANY, CHARLOTTE A. WRIGHT, A.P.A., IVY GAYNOR, P.O., ANDREA W. EVANS, CHAIRWOMAN AND CHIEF EXECUTIVE OFFICER OF NEW YORK STATE DIVISION OF PAROLE, LUIS O. ALVARADO, DEBORAH WATKINS, JOHN DOE CLERICAL STAFF WORKER(S) AT PLAINTIFF'S NYC DOCS CORRECTIONAL FACILITY, WHO FAILED TO TRANSMIT PLAINTIFF'S SENTENCING PAPERWORK TO THE NEW YORK STATE DEPARTMENT OF CORRECTIONAL SERVICES (DOCS), BRIAN FISCHER, COMMISSIONER OF THE NEW YORK STATE DEPARTMENT OF CORRECTIONAL SERVICES (DOCS), K. MOSLEY, INMATE RECORDS COORDINATOR AT WATERTOWN CORRECTIONAL FACILITY, NYS DOCS OFFICIAL WHO WROTE ON PLAINTIFF'S UNDATED COMPLAINT LETTER, COUNSELOR J. CLEMENT, CC, COUNSELOR CLOUGH AT WATERTOWN CORRECTIONAL FACILITY, WATERTOWN CORRECTIONAL FACILITY DEFENDANT WITH INITIALS KG, FOUR MEMBERS OF THE IGRC AT WATERTOWN CORRECTIONAL FACILITY, CHAIRPERSON OF THE IGRC AT WATERTOWN CORRECTIONAL FACILITY, GEORGE B. ALEXANDER, CHAIRPERSON AND CHIEF EXECUTIVE OFFICER OF NEW YORK STATE DIVISION OF PAROLE, SENIOR PAROLE AGENT WALTERS, V. DEVLIN, APA, BILLY BOE NEW YORK STATE DIVISION OF PAROLE EMPLOYEE, AT WATERTOWN CORRECTIONAL FACILITY WHO WAS RESPONSIBLE FOR THE PROPER CALCULATION OF PLAINTIFF'S TIME, MARY KOPP, EMPLOYEE AT NEW YORK STATE DIVISION OF PAROLE IN ALBANY, THERESA VIGLIONE, INMATE RECORDS COORDINATOR I AT ULSTER CORRECTIONAL FACILITY FOR DECEMBER 2007 TO JUNE 2008, GAIL WILLIAMS, INMATE RECORDS COORDINATOR II AT ULSTER CORRECTIONAL FACILITY FROM DECEMBER 2007 TO JUNE 2008, ORLINE ROHDE, A CORRECTIONS OFFICER MEMBER OF THE IGRC AT WATERTOWN CORRECTIONAL FACILITY, COMMISSIONER DORA B. SCHRIRO, OF THE NEW YORK CITY DEPARTMENT OF CORRECTIONS (NYCDOC), SUPERINTENDENT EKPE D. EKPE, OF WATERTOWN CORRECTIONAL FACILITY, MICHAEL MOE, SECOND CORRECTIONS OFFICER MEMBER OF THE IGRC AT WATERTOWN CORRECTIONAL FACILITY, VALERIE OLIVER, BUREAU CHIEF, NYC DOCS CUSTODY MANAGEMENT & ENVIRONMENT HEALTH DEPARTMENT, VENITA MABRA, NYC DOC INMATE RECORDS COORDINATOR, WARDEN CARMINE LABRUZZO,

*Defendants-Appellees*,

2

BUREAU CHIEF, DEPARTMENT OF CORRECTIONS CUSTODY MANAGEMENT & ENVIRONMENTAL HEALTH DEPARTMENT FROM JUNE 2005 TO JULY 2006, COORDINATOR NEW YORK CITY DEPARTMENT OF CORRECTIONS INMATE RECORDS, FROM JUNE 2005 TO JULY 2006, JOHN DOE, CLERICAL STAFF WORKER AT RIKERS ISLAND WHO FAILED TO TRANSMIT PLAINTIFF'S SENTENCING PAPERWORK TO THE NEW YORK STATE DEPARTMENT OF CORRECTIONAL SERVICES (DOCS), RICHARD ROE, SUPERVISOR OF JOHN DOE CLERICAL STAFF WORKER(S) AT PLAINTIFF'S NYC DOC CORRECTIONAL FACILITY, WHO FAILED TO TRANSMIT PLAINTIFF'S SENTENCING PAPERWORK TO THE NEW YORK STATE DEPARTMENT OF CORRECTIONAL SERVICES (DOCS), STAFF WORKER, AT RIKERS ISLAND WHO FAILED TO TRANSMIT PLAINTIFF'S SENTENCING PAPERWORK TO DEPARTMENT OF CORRECTIONAL SERVICES, JOHN DOES, EMPLOYEES OF THE CITY OF NEW YORK, RICHARD ROES, SUPERVISORY EMPLOYEES OF THE CITY OF NEW YORK, MICHAEL MOE, SUPERINTENDENT OF ULSTER CORRECTIONAL FACILITY FROM DECEMBER 2005 TO JULY 2006, MICHAEL MOE, INMATE RECORDS COORDINATOR I AT ULSTER CORRECTIONAL FACILITY FROM DECEMBER 2005 TO JULY 2006, NEW YORK STATE DIVISION OF PAROLE, EMPLOYEE WITH INITIALS LES AT ULSTER CORRECTIONAL FACILITY WHO WROTE MEMORANDA TO PLAINTIFF ON DECEMBER 29, 2005 AND JANUARY 4, 2006, LARRY LOE, NEW YORK STATE DIVISION OF PAROLE SUPERVISOR OF NEW YORK STATE DIVISION OF PAROLE EMPLOYEES WITH INITIALS "LES" AT ULSTER CORRECTIONAL FACILITY WHO WROTE MEMORANDA TO PLAINTIFF ON DECEMBER 29, 2005 AND JANUARY 4, 2006,

*Defendants.*

Before: WINTER AND LIVINGSTON, *Circuit Judges*, and RAKOFF, *District Judge*.[1]

Plaintiffs-Appellants Terence Sudler and Timothy Batthany, former inmates of the New York State and New York City prison systems, appeal the district court's dismissal of their consolidated 42 U.S.C. § 1983 actions as against some Defendants-Appellees pursuant to Fed. R. Civ. P. 12(b)(6) and its award of summary judgment to the remaining Defendants-Appellees pursuant to Fed. R. Civ. P. 56. The district court

---

[1] The Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, sitting by designation.

held that Plaintiffs-Appellants' due process rights were violated when they were imprisoned for periods of time longer than their judicially imposed sentences, but found that qualified immunity shielded Defendants-Appellees from liability. We conclude that the Defendants-Appellees are entitled to qualified immunity without reaching the question whether Plaintiffs-Appellants' constitutional rights were violated. We therefore affirm the district court.

JEFFREY A. ROTHMAN, New York, N.Y. (Matthew D. Brinckerhoff, Emery Celli Brinckerhoff & Abady, LLP, New York, N.Y., *on the brief*) *for Plaintiffs-Appellants.*

SIMON HELLER, Assistant Solicitor General, New York, N.Y., *for* Eric T. Schneiderman, Attorney General of the State of New York (Barbara D. Underwood, Solicitor General, Richard Dearing, Deputy Solicitor General, *on the brief*) *for New York State Defendants-Appellees.*

THADDEUS HACKWORTH, New York, N.Y., *for* Michael A. Cardozo, Corporation Counsel of the City of New York (Elizabeth S. Natrella, Leonard Koerner, *on the brief*) *for City of New York Defendants-Appellees.*

LIVINGSTON, CIRCUIT JUDGE:

On appeal from the district court's grant of a motion to dismiss and a motion for summary judgment, this case presents two issues: (1) whether the due process rights of Plaintiffs-Appellants Terence Sudler ("Sudler") and Timothy Batthany ("Batthany") (collectively, "Plaintiffs") were violated by a host of officers and employees of the New York State and New York City prison systems (collectively, "Defendants"), and (2) whether these officers and employees are entitled to qualified immunity for the conduct forming the predicate of Plaintiffs' 42 U.S.C. § 1983 suits. Because we conclude that,

4

regardless whether Plaintiffs' due process rights were violated, Defendants are entitled to qualified immunity for the conduct in question, we affirm the district court.

## BACKGROUND

*1. Plaintiffs' Sentences and Incarceration*

While the parties hotly dispute many of the alleged facts in this case, the basic facts relevant to disposition of this appeal are not contested.

a. Terence Sudler

In 2000, Terence Sudler was imprisoned following his conviction in New York State of robbery in the third degree and criminal sale of a controlled substance in the fifth degree. He was sentenced to serve concurrent, indeterminate sentences of 3 to 6 years on the robbery count and 2.5 to 5 years on the criminal sale count. Sudler was released from prison and placed on parole on September 9, 2003. While on parole, Sudler was arrested for petit larceny. On June 23, 2005, he pled guilty to a parole violation and was sentenced to serve the remaining seven months and two days of his 2000 sentence in prison.[2]

About one month later, on July 13, Sudler appeared in New York Supreme Court, Bronx County, on the petit larceny charges for which he had recently been arrested. At the hearing, Sudler withdrew his earlier plea of not guilty as to the two counts of petit larceny and entered guilty pleas on each of these misdemeanor counts.

[2] Below, the parties disputed whether a judge's decision to require a parolee to serve the remainder of his term in prison as a consequence of a parole violation is a "sentence." As the parties do not dispute before us whether such a decision constitutes a "sentence," we assume *arguendo* that it does.

He was sentenced by Justice Clancy of the New York Supreme Court as follows: "Sentence imposed on docket ending 31460 is nine months. Sentence imposed on docket ending 5749 is also nine months. Those sentences to run concurrent, and those sentences to run concurrent with the parole violation." Sudler's "Sentence and Commitment" form confirmed that his sentences on the petit larceny counts would "run concurrent with . . . [his] parole time."

Sudler served the two concurrent sentences for petit larceny in the custody of the New York City Department of Correction ("NYCDOC") at Rikers Island ("Rikers"). When these sentences expired (which occurred in December 2005, due to a variety of credits), he was transferred from Rikers into the custody of the New York State Department of Correctional Services ("DOCS") to serve the remainder of his undischarged felony sentence.[3]

At the time of his transfer to DOCS custody, Sudler's release date (the date on which he would be released from DOCS custody) was calculated. Defendant Linda E. Stevens ("Stevens"), an employee of the New York State Department of Parole ("DOP"), reviewed Sudler's file and determined that he was not entitled to parole jail time credit for the period of time he spent serving his misdemeanor sentences for petit larceny at Rikers. "Parole jail time" ("PJT") credits may be given to a prisoner in DOCS custody for some or all of his time in NYCDOC custody and serve to reduce the number of days

---

[3] Subsequent to the events giving rise to this litigation, DOCS merged with the Division of Parole to form the Department of Corrections and Community Supervision. The merger is immaterial to the disposition of this case, and we use the former name of both agencies here.

the prisoner must spend in DOCS custody. Although there is evidence that the parole file that Stevens reviewed contained a copy of Sudler's Sentence and Commitment form describing his misdemeanor sentences, which indicated that the sentences served at Rikers were to run concurrently with his sentence for violation of parole, Stevens did not give Sudler PJT credits for time spent serving his sentences at Rikers, apparently because she misunderstood DOCS policy to require all sentences in cases such as Sudler's to run consecutively, not concurrently.[4] As a result, Sudler's release date was calculated to be July 10, 2006.

Sudler twice objected in writing that his release date had been calculated incorrectly, but each time was assured that the release date was correct. So far as the record shows, Sudler did not file a formal grievance with the relevant inmate grievance resolution committee, see N.Y. Comp. Codes R. & Regs. Tit. 7, § 701 (establishing inmate grievance resolution committees to resolve "complaint[s] . . . about the substance or application of any written or unwritten policy, regulation, procedure or rule of [DOCS] . . . or the lack of a policy, regulation, procedure, or rule," *id*. at §

---

[4] There is evidence that at a time before the events at issue here the Division of Parole's policy was generally *not* to afford parole violators PJT credits for time served on local, definite sentences prior to transfer to DOCS custody, even when a sentencing judge had characterized the local sentence as concurrent with the parole revocation sentence. At all relevant times, § 70.40(3)(c)(iii) of New York's Penal Law has provided that when a paroled offender is arrested on a new charge for which he is ultimately convicted and sentenced to a term of imprisonment, he receives PJT credit against his undischarged parole revocation sentence only for "the portion of the time spent in custody that exceeds the . . . term . . . imposed for that conviction." The change in the State's policy – of which Stevens appears to have been unaware – seems an attempt to effectuate the result contemplated by sentencing orders specifying concurrent time, notwithstanding § 70.40(3)(c)(iii).

7

701.2(a)); *see also In Re Isaac v. Fischer*, 891 N.Y.S. 2d 918, 918 (N.Y. App. Div. 2010) (involving an inmate who challenged his release date by means of the inmate grievance system); nor did he file a state habeas corpus petition or a petition under New York Civil Practice Law and Rules Article 78 challenging his release date calculation. Sudler was ultimately discharged from DOCS custody on July 10, 2006, approximately six months later than he would have been released had he received PJT credits for the time spent serving his sentences at Rikers.

b. Timothy Batthany

Timothy Batthany's story is similar to Sudler's. He was convicted on a guilty plea of second degree attempted burglary, a felony under New York law, in state court, and was sentenced, *inter alia*, to a determinate three-year prison term. On May 19, 2006, Batthany was released on parole, but was subsequently arrested on new charges.[5] On September 17, 2007, he pled guilty to violating his parole and was sentenced to serve the remaining seven months and nineteen days of his sentence in prison. On December 3, 2007, Batthany pled guilty to one count of criminal contempt and one count of third degree assault, both misdemeanors. Judge Harrington of the New York Criminal Court sentenced Batthany to "six months jail" on these two offenses, "to run concurrently, as well as with the parole violation."

---

[5] Although below Plaintiffs and the Defendants associated with the State of New York ("State Defendants") agreed that Batthany was released on parole, the State Defendants suggest in their brief that Batthany was not a parolee at all, but rather was released on post-supervision release. Because the State Defendants admit that this distinction does not make a difference to the merits of this appeal, we do not address this potential factual disagreement and refer to both Sudler and Batthany throughout as "parolees."

8

After serving the requisite time on his misdemeanor charges at Rikers, Batthany was transferred back into DOCS custody in January 2008 to serve the remainder of his first sentence, and his release date was calculated. Although she did not have Batthany's Sentence and Commitment form describing the misdemeanor charges and thus did not know whether the judge had ordered these more recent sentences to run concurrently with, or consecutively to, his sentence for the parole violation, DOP employee Defendant Charlotte Wright declined to give Batthany PJT credits for the time spent serving his sentence at Rikers. Batthany's release date was calculated to be August 23, 2008. He complained to the relevant authorities that his release date had been miscalculated and was repeatedly told that if he wanted to receive PJT credit, he needed to produce documentation that the judge who sentenced him on the misdemeanor charges had indicated that these sentences were to be served concurrently with his earlier, felony sentence. On June 2, 2008, Batthany's lawyer from the Prisoner's Legal Services of New York obtained a copy of his Sentence and Commitment form and provided it to DOP. Batthany was released from DOCS custody the next day, approximately six weeks later than he would have been if he had promptly received credit for the time served at Rikers.

2. *Relevant New York State Prison Regulations and Policies*

Plaintiffs allege that DOP's failure to credit Sudler, or to credit Batthany promptly, for the amount of time served at Rikers on local sentences was a violation of their right to due process. They also allege that this failure was not accidental. Rather, they argue that DOP's default policy is not to credit an inmate returned for

9

violation of his or her parole (a "returned parole violator" or "RPV") for time served pursuant to a local sentence, but rather to credit the RPV for such time served only when DOP is presented with certain forms indicating that the judge who sentenced the RPV to the local sentence instructed that the local sentence run concurrently with the older state sentence.

At the relevant time, DOP's official policy with respect to local sentences ordered to run concurrently with a sentence for a violation of parole was as follows: "[T]he violator will receive parole jail time credit from the date of the arrest or the date of the lodging of the parole warrant, whichever occurs first[,] up to the day before the date of return to a New York State Correctional Facility." However, as the State Defendants admit, where an RPV's file failed to indicate whether the sentencing judge ordered the local sentence to run concurrently with the parole violation sentence, DOP considered the sentences consecutive. Furthermore, DOP policy at the relevant time was to accept only a Sentence and Commitment form or a Certificate of Disposition as indicating that the sentencing judge intended the RPV's sentences to run concurrently. On at least some occasions, DOP staff would place the burden of providing either a Sentence and Commitment form or a Certificate of Disposition on the RPV contending that his or her release date had been miscalculated, rather than themselves seeking out the needed documents.

Plaintiffs also argue that NYCDOC staff contributed to the violation of their due process rights by failing to send Sentence and Commitment forms to DOP when RPVs were transferred from NYCDOC custody to DOCS custody. Plaintiffs allege that

10

NYCDOC "did not transmit [Sudler's and Batthany's] Sentence and Commitment form[s] to DOCS when Plaintiff[s were] transferred into their custody," and that NYCDOC "as a matter of policy and practice does not send paperwork for misdemeanor sentences to . . . DOCS, even when the sentence reflected on that paperwork bears directly on the time to be served in . . . DOCS custody."[6]

*3.     Procedural History[7]*

On December 31, 2008, Sudler brought suit against dozens of individuals who had, at the relevant time, been DOCS, DOP, and NYCDOC officers and employees, seeking compensatory and punitive damages for "violation of plaintiff's constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its Fourth and Fourteenth Amendments."  Compl. ¶ 43.  On July 31, 2009, the district court (Lynch, *J.*) granted the City Defendants' motion to dismiss the action as against them pursuant to Fed. R. Civ. P. 12(b)(6).  *See Sudler v. City of New York*, No. 08-civ-11389 (GEL), 2009 WL 2365335, at *3 (S.D.N.Y. July 31, 2009).  The district court noted that the complaint's "only concrete allegation against the City Defendants is that they 'did not transmit Plaintiff's Sentence and Commitment form to DOCS when Plaintiff was transferred into [State] custody.'" *Id.* at *2 (alteration in original) (quoting Compl. ¶ 31).  The district court noted that the complaint also "charges that

_____

[6] Because Plaintiffs' suits against the defendants associated with the City of New York (collectively, "City Defendants") were dismissed on a Fed. R. Civ. P. 12(b)(6) motion, we rely here on the allegations in Plaintiffs' complaint, rather than on the evidence they have adduced.

[7] Only the procedural history relevant to this appeal is given here.

the State [of New York] was fully aware of the concurrent nature of [Sudler's] sentence, and detained him pursuant to a deliberate policy and practice of disregarding the terms of such concurrent sentences." *Id.* Furthermore, the district court opined that "the defendants associated with . . . DOCS had the responsibility for determining the legal basis of [the] custody" they exercised over Sudler, and could have themselves requested the Sentence and Commitment form. *Id.* Thus, the district court determined that any harm suffered by Sudler did not expose the City Defendants to liability, and therefore dismissed Sudler's action as against them. *Id.* at *3.[8]

Upon Judge Lynch's elevation to this Court, Sudler's case was reassigned to Judge Daniels, who referred the case to Magistrate Judge Peck. Judge Peck then consolidated Sudler's action with Batthany's for pretrial purposes. (Batthany had filed a complaint on July 22, 2009, which he had amended on November 30, 2009.) The two Plaintiffs then filed a consolidated complaint on February 16, 2010, in which for the first time they sought class certification, defining the putative class as "all persons who were expressly sentenced to incarceration for a local misdemeanor and parole violation to run concurrently, but whom nevertheless have been, or will be, subjected to an administrative alteration of that judicial sentence to consecutive sentences." They later amended this complaint, filing their second consolidated class action complaint (the "Complaint") on March 19, 2010.

---

[8] Judge Lynch denied a motion to reconsider his decision dismissing Sudler's complaint as against the City Defendants on October 14, 2009.

On January 28, 2010, the same day Judge Peck consolidated the two actions, he also issued a report and recommendation recommending that the district court grant the City Defendants' motion to dismiss Batthany's amended complaint, relying on Judge Lynch's earlier decision dismissing Sudler's action as against the City Defendants. Judge Daniels adopted this report and recommendation on March 26, 2010. *Batthany v. City of New York*, No. 09-civ-6510 (GBD) (AJP), 2010 WL 1257323 (S.D.N.Y. Mar. 26, 2010). He noted Batthany's argument that his "case has additional facts demonstrating the involvement of the City Defendants as a causal factor in the unlawful deprivation of [his] liberty that make it distinguishable [from] the *Sudler* case," and also the fact that Batthany's action involved "claims under New York state law that did not exist in the *Sudler* case," but found these "objections . . . to be without merit." *Id.* at *1.

In July 2010 the State Defendants, who remained in the case, moved for summary judgment. On October 6, 2010, Judge Peck issued a Report and Recommendation recommending that the district court grant the motion. *Sudler v. Goord*, Nos. 08-civ-11389 (GBD) (AJP), 09-civ-6510 (GBD) (AJP), 2010 WL 4273277, at *18 (S.D.N.Y. Oct. 6, 2010) ("Report and Recommendation" or "R&R"). Judge Peck began by rejecting the State Defendants' argument that, because it is the sole responsibility of parole authorities to calculate PJT credits under New York law, prison officials are not bound by a sentencing judge's order that a new sentence should run concurrently with the undischarged portion of a prior sentence on which an inmate has been paroled. *See id.* at *9. Judge Peck determined that a New York state judge has

13

the authority to order that an RPV's sentence for parole violation run concurrently with another sentence. *See id.* at *9-11.

Next, citing *Hill v. United States ex rel. Wampler*, 298 U.S. 460, 465 (1936), Judge Peck noted that a jailor's "authority to confine a prisoner begins and ends with the sentence pronounced by the judge." R&R at *11. The conduct of the State Defendants, he wrote, had "the practical effect of . . . alter[ing] the length of the sentence pronounced by the judge," a state of affairs impermissible, he concluded, under the Supreme Court's and this Circuit's constitutional cases. *Id.* Judge Peck went on to explain that his conclusion would stand even if, under New York law, state court judges do not have the authority to order that an RPV's sentence for parole violation run concurrently with another state sentence: "Even if this Court were wrong, and [New York law] did not permit RPV inmates such as Sudler and Batthany to receive concurrent sentences, DOP still had no authority to unilaterally correct the sentence as imposed by the sentencing judge." *See id.* at *13. Judge Peck found "defendants' argument that they had no duty to seek out any inmate's sentence and commitment document . . . both abhorrent and absurd," since "the authority to detain inmates derives exclusively from the sentence or judgment of the court," and therefore "it is axiomatic that parole and prison officials know, or should know, the nature and duration of each prisoner's sentence." *Id.* at *14 (internal quotation marks omitted).

Having concluded that the State Defendants violated Plaintiffs' constitutional rights, Judge Peck then considered whether recovery for these violations is barred by the doctrine of qualified immunity. He concluded that qualified immunity applies. *Id.*

14

at *17. Noting that "the official conduct disputed here, *i.e.*, administrative alteration of the sentence pronounced by the judge, may have been required by state statute," Judge Peck observed that the conduct underlying Sudler's suit occurred prior to our decision in *Earley v. Murray*, 451 F.3d 71 (2d Cir. 2006), the first case in this Circuit that might have suggested the illegality of the State Defendants' conduct in such circumstances. *See* R&R at *16. As to the conduct underlying Batthany's suit, Judge Peck pointed out that, even after *Earley* was decided, New York state courts "have continued . . . to find permissible the challenged conduct of imposing consecutive sentences for the parole violation sentence." *Id.* "Where . . . state judges do not themselves comprehend that particular conduct violates the law," Judge Peck opined, "it cannot be said that the law was clearly established for purposes of qualified immunity." *Id.* at *17. Furthermore, Judge Peck determined that no case had been decided that clearly established that the precise conduct at issue here – "DOP's placing the burden on the inmate to prove the terms of his sentence" – was illegal. *Id.* Judge Peck concluded by recommending that class certification, injunctive relief, and leave to amend be denied. *Id.* at *17-18 & n.22.

On February 23, 2011, Judge Daniels issued a memorandum decision and order adopting the R&R. *Sudler v. Goord*, Nos. 08-cv-11389 (GBD) (AJP), 09-cv-06510 (GBD) (AJP), 2011 WL 691239, at *4 (S.D.N.Y. Feb. 23, 2011). Judge Daniels agreed with Judge Peck that the policy implemented by DOP is unconstitutional. In reasoning that largely tracked the R&R, Judge Daniels held that an inmate has a constitutional right to serve only the sentence imposed by a sentencing judge. *Id.* at *5-6. Judge Daniels

15

also agreed, however, that qualified immunity prevented recovery in this case. No previous cases, Judge Daniels noted, "consider[ed] or otherwise implicate[d] DOP's parole violator policy"; nor did they "involve analogous conduct or facts." *Id.* at *8. Thus, the constitutional right which the State Defendants violated "was not clearly established at the time the violation occurred," *id.*, and qualified immunity applied. Accordingly, Judge Daniels granted the State Defendants' motion for summary judgment. *Id.* at *9. He also agreed with the R&R as to the proper disposition of Plaintiffs' pending motions and therefore denied class certification and leave to amend, as well as Plaintiffs' request for injunctive relief. *See id.* at *9 & n.17.

Judgment was entered on Judge Daniel's grant of summary judgment on March 8, 2011. Plaintiffs timely appealed.[9]

## DISCUSSION

*1.    Standard of review*

We review *de novo* a district court's dismissal pursuant to Fed. R. Civ. P. 12(b)(6), "accept[ing] all well-pleaded allegations in the complaint as true [and] drawing all reasonable inferences in the plaintiff's favor." *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010). We likewise review a district court's grant of summary judgment *de novo*, with "[a]ll evidence submitted on the motion . . . construed in the manner most favorable to the

---

[9] Plaintiffs' notice of appeal makes clear that they wish to challenge the orders granting the City Defendants' motions to dismiss, as well as the order granting the State Defendants' motion for summary judgment.

16

nonmoving party." *Horvath v. Westport Library Ass'n*, 362 F.3d 147, 151 (2d Cir. 2004). "Summary judgment is appropriate only if the moving party shows that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003). The moving party is entitled to summary judgment where that party "has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on" an essential element of a claim on which the party bears the burden of proof. *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010). We may affirm on any ground supported by the record. *See Beal v. Stern*, 184 F.3d 117, 122 (2d Cir. 1999).

*2. Alleged Violation of Plaintiffs' Constitutional Rights*

We begin with the State Defendants.[10] Plaintiffs' argument that the State Defendants violated their constitutional rights is straightforward: They have a due process right, as articulated in *Hill v. United States ex rel. Wampler*, 298 U.S. 460 (1936), to serve only the sentence imposed by the sentencing judge, until such time as this sentence is modified by a judge; the State Defendants held Plaintiffs in custody for longer than the period contemplated by the sentencing judge; *ergo*, the State Defendants violated Plaintiffs' due process rights.[11] The State Defendants do not

---

[10] The case against the City Defendants is addressed in section 4.b *infra*.

[11] We have suggested in the past, and other courts within and without this Circuit have held, that detention beyond that authorized by law may violate the Eighth Amendment. *See Calhoun v. N.Y. State Div. of Parole Officers*, 999 F.2d 647, 654 (2d Cir. 1993) (assuming that detention of a prisoner beyond the end of his term could

17

dispute the minor premise listed above. Rather, they focus the bulk of their argument to this Court on the major premise: that Plaintiffs, in the circumstances of this case, had a constitutional right to serve only the term imposed by the sentencing judge.

The seminal case for the constitutional right at issue here is *Wampler*. In that case, Wampler was convicted of tax evasion in federal court. *Id.* at 461. The sentencing judge pronounced the following sentence: "Fine five thousand dollars and eighteen months in penitentiary on each count of the indictment, said terms of imprisonment to be computed as beginning this 28th day of December 1933; fines to be cumulative and terms of imprisonment to run concurrently and that [Wampler] pay costs of proceedings." *Id.* The clerk of the federal court in which the sentence had been pronounced, however, issued a commitment form bearing the following:

> That [Wampler] pay a fine of Five Thousand Dollars and be imprisoned . . . for eighteen months on each count of the indictment; said term of imprisonment to be computed as beginning this 28th day of December 1933; the fines to be cumulative and the terms of imprisonment to run concurrently; and that [Wampler] pay the costs of prosecution; and in default of payment of said fines and costs, he stand further committed until the payment of said fines and costs or until discharged by due process of law.

violate the Eighth Amendment in appropriate circumstances, but finding no violation where the unauthorized detention lasted only five days and the plaintiff failed to demonstrate the defendants' deliberate indifference); *see also Sample v. Diecks*, 885 F.2d 1099, 1108-10 (3d Cir. 1989); *Haygood v. Younger,* 769 F.2d 1350, 1354-55 (9th Cir. 1985); *Rivera v. Carroll*, No. 07-civ-7847 (RJS), 2009 WL 2365240, at *6-7 (S.D.N.Y. Aug. 3, 2009). Plaintiffs, however, have not relied on the authority of the Eighth Amendment, either in their discussion of the merits of their case or in their argument that the court below erred in holding qualified immunity applicable. Accordingly, any argument based on the Eighth Amendment has been waived. *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998).

*Id.* at 461-62. Wampler filed a petition for a writ of habeas corpus, arguing that his detention beyond the eighteen-month term originally imposed by the sentencing judge was illegal. *See id.* at 462-63.

The United States Supreme Court agreed with Wampler. "The court speaks through its judgment, and not through any other medium," the Court held.[12] *Id.* at 465. Thus, the clerk's addition of the requirement that Wampler be detained until payment of the fines and costs assessed – even though the clerk's addition of this requirement was assertedly a common practice in the district in which Wampler was sentenced – was insufficient to incorporate that requirement into the sentence. *See id.* Accordingly, the Court held that issuance of the writ was appropriate. *See id.* at 467. *Wampler* did not make clear which provision of the federal Constitution rendered issuance of the writ appropriate, or even whether the Constitution was, in fact, the source of the infirmity in the petitioner's sentence.

---

[12] The Court also stated that "[t]he only sentence known to the law is the sentence or judgment entered upon the records of the court." *Id.* at 464. This expression features prominently in Plaintiffs' brief. In *Wampler,* however, this observation was not made in relation to any potential legal infirmity in requiring Wampler to remain in prison until payment of all fines and costs, despite the fact that this condition was not a part of the sentence pronounced by the judge. Rather, the Court's statement arose in a discussion regarding whether a collateral attack can be made on the accuracy of the judgment "entered upon the records of the court," on the theory that the judgment was not "the authentic expression of the sentence of the judge." *Id.* The Court held that such a collateral attack is impermissible, since "[t]he only sentence known to the law is the sentence or judgment entered upon the records of the court," which "[u]ntil corrected in a direct proceeding . . . says what it was meant to say, and this by an irrebuttable presumption." *Id.* The Court noted that "[i]f the entry is inaccurate, there is a remedy by motion [in a direct proceeding] to correct it to the end that it may speak the truth." *Id.*

Some seventy years after *Wampler*, this Court had occasion to consider its import in *Earley v. Murray*, 451 F.3d 71.[13] Earley, a convicted criminal defendant, disputed his obligation to serve a five-year term of post-release supervision ("PRS") to which he would be subject upon release from prison. Earley's sentencing judge failed to mention that this mandatory five-year term of PRS would be imposed as required by N.Y. Penal Law § 70.45. *See id.* at 73. Nevertheless, after his sentencing, "DOCS administratively added a five-year term of PRS to Earley's sentence without informing Earley." *Id.* Earley, having exhausted his state administrative remedies, sought relief in state court, seeking to be resentenced according to the terms imposed by the sentencing judge. *See id.* The state court "found that, because the PRS term is mandatory under New York law, Earley's request to eliminate it from his sentence could not be granted." *Id.* Earley then sought a writ of habeas corpus. *See id.* at 72.

Addressing his claim, we began by noting that pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d)(1), a writ of habeas corpus may not be granted unless a state court's adjudication of a constitutional claim is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Id.* at 74 (internal quotation marks omitted). We then held that "clearly established Supreme

---

[13] The only case prior to *Earley* in which this Court so much as cited *Wampler* is *United States v. Marquez*, 506 F.2d 620 (2d Cir. 1974), in which we held that a convicted criminal defendant was entitled "to have his sentence as recorded in the written judgment and commitment, and docket entries corrected so as to conform with [the district court's] original oral pronouncement." *Id.* at 622.

Court precedent renders the five-year PRS term added to Earley's sentence by DOCS invalid." *Id.* at 76. We characterized *Wampler* as holding that "[t]he judgment of the court establishes a defendant's sentence, and that sentence may not be increased by an administrator's amendment." *Id.* at 75. We also clarified that the right recognized in *Wampler* sounds in procedural due process.[14] *See id.* at 76 n.1. Because "[p]ost-release supervision . . . is considered to be 'custody,'" *id.* at 75, DOCS was not permitted to impose the five-year period of PRS at issue, despite the fact that New York law required the imposition of a five-year period of PRS in Earley's case, *see id.* at 76.[15] Accordingly, we vacated the district court's judgment and remanded with instructions to issue a writ of habeas corpus in the event the district court determined that Earley's petition was timely. *See id.* at 76.

Thus, *Wampler* and *Earley* together stand for the proposition that administrative authorities have "no . . . power to alter a sentence," because "[t]he

---

[14] Specifically, we noted that "[a]lthough *Wampler* does not identify the source of the rule that it announces, we believe that it is based in the due process guarantees of the United States Constitution. *Wampler* does not hold that the defendant *could* not have been sentenced to the punishment that the state attempts to impose on him. It simply recognizes that he *was* not sentenced to that punishment. Any deficiency in the sentence could have been corrected through the proper procedures." *Earley*, 451 F.3d at 76 n.1.

[15] In an opinion denying the *Earley* respondent's petition for rehearing, we elaborated: "The fact that New York law mandates a different sentence than the one imposed may render the sentence imposed unlawful, but it does not change it. The sentence imposed remains the sentence to be served unless and until it is lawfully modified." *Earley v. Murray*, 462 F.3d 147, 149 (2d Cir. 2006).

21

imposition of a sentence is a judicial act; only a judge can do it."[16]  *Earley*, 451 F.3d at 76.  A person in custody by virtue of such conduct is, in appropriate circumstances, entitled to habeas relief.  These two cases leave open, however, several questions which the State Defendants argue are important to resolution of the present claims.

At the start, *Earley* makes clear that even the illegality of a judge's sentence does not affect a prisoner's right under *Wampler* to serve only the sentence imposed by the sentencing judge, until such time as that sentence is lawfully modified by a judge.  *See Earley v. Murray*, 462 F.3d 147, 149 (2006) (denying petition for rehearing).  Neither *Earley* nor *Wampler* addresses a situation like the one at bar, however, involving not one sentence but the relationship between one sentence and another sentence imposed by a different judge in a separate proceeding.  The State Defendants argue that this distinction is important, even critical, to this matter's resolution.

First, the State Defendants suggest, the characterization of a later sentence as either concurrent or consecutive to an earlier sentence is not itself a part of either sentence, and therefore does not fall within the terms of *Earley*'s holding.  For this reason, the New York Court of Appeals in *People ex rel. Gill v. Greene,* 12 N.Y.3d 1, 5-6 (2009)*,* held that a sentencing court need not pronounce at sentencing that a later-imposed sentence is to be served consecutively to previous undischarged sentences (as

---

[16] This Court also discussed liability under the right recognized in *Wampler* and *Earley* in *Scott v. Fischer*, 616 F.3d 100 (2d Cir. 2010).  However, in *Scott* we merely concluded that qualified immunity shielded the defendants in that case from liability under 42 U.S.C. § 1983 for the alleged violation of the plaintiff's due process rights, without elaborating in any way on the scope and nature of the right recognized in *Wampler* and *Earley*.  *See id.* at 106-11.

22

required in Gill's case by New York law) in order for correctional authorities properly to calculate a release date based on the assumption of consecutive time:

> The problem in . . . *Earley* was that a part of the sentence – the PRS term – was never imposed. . . . That was indeed an error that only a court could correct. But here, the sentence at issue – a term of imprisonment for 2 1/2 to 5 years – was imposed. All that was omitted was the characterization of the sentence as either concurrent or consecutive.
> That characterization is provided by the statute, Penal Law § 70.25(2-a), which says the sentence must be consecutive. Nothing in the statute and nothing in the Constitution requires the sentencing court to say the word "consecutive," either orally or in writing.

*Id*. at 6; *accord Hayes v. Conway*, No. 08-civ-5280 (ARR), 2010 WL 2921587, at *17-18 (E.D.N.Y. July 19, 2010); *Chandler v. Barkley*, No. 09-civ-4648 (SLT), 2010 WL 1780011, at *2-3 (E.D.N.Y. May 3, 2010); *Washington v. Goord*, No. 07-civ-7150 (LTS) (FM), 2009 WL 3805599, at *6 (S.D.N.Y. Nov. 13, 2009); *Vasquez v. Loiodice*, No. 07-civ-7164 (HB), 2009 WL 2575775, at *2-3 (S.D.N.Y. Aug. 20, 2009).

The State Defendants next argue that *Earley* should not be extended to the present context for the reason that it was impossible under state law for Sudler's and Batthany's parole revocation sentences to run concurrently with their misdemeanor sentences, as ordered by their sentencing judges, so that the State Defendants (whatever policy they might follow in affording PJT credits in the circumstances here) could not carry out the sentences actually imposed. According to the State Defendants, the orders that Sudler's and Batthany's local sentences run concurrently with their parole violation sentences could not be executed by DOCS because the parole violation penalty imposed on both Sudler and Batthany required each one to serve the

23

remainder of his old sentence in prison, and New York law provided that these sentences could not begin to run until Sudler and Batthany were returned to a facility under DOCS's jurisdiction. *See* N.Y. Penal Law § 70.40(3)(a) ("When a person is alleged to have violated the terms of . . . parole and the state board of parole has declared such person to be delinquent, the declaration of delinquency shall interrupt the person's sentence as of the date of the delinquency and such interruption shall continue until the return of the person to an institution under the jurisdiction of the state department of corrections and community supervision."). Thus, on the State Defendants' view, it was impossible for Sudler's and Batthany's local sentences to run concurrently with their parole violation sentences, entitling Plaintiffs to PJT credits upon transfer to DOCS, because the parole violation sentences *were not running* at the time of Plaintiffs' incarceration at Rikers.[17]

The State Defendants argue that the present case is thus analogous to the D.C. Circuit's decision in *Tippitt v. Wood*, 140 F.2d 689 (D.C. Cir. 1944), which was decided

---

[17] Moreover, as previously noted, § 70.40(3)(c)(iii) of New York's Penal Law also specifically provides that when a paroled offender is arrested on a new charge for which he is ultimately convicted and sentenced to a term of imprisonment, he receives PJT credit against his undischarged parole revocation sentence only for "the portion of the time spent in custody that exceeds the . . . term . . . imposed for that conviction" – a provision that some courts have read to mean that PJT credits are not otherwise afforded in this context, even when a sentencing judge has ordered the term on a new charge to run concurrently with an undischarged parole revocation sentence. *See Torres v. City of N.Y.*, No. 94-civ-4604, 1996 WL 434535, at *3 (S.D.N.Y. Aug. 2, 1996) (holding that a parole violator was not entitled to PJT credit, even though the sentencing judge characterized the parole revocation sentence as "concurrent" with a prior sentence); *Edwards v. Preiser*, 380 N.Y.S. 2d 402, 402 (N.Y. App. Div. 1976) (same).

only a few years after *Wampler*. Tippitt pled guilty in federal court in connection with a crime he committed while on parole and was sentenced to a term of four years "to run concurrently with any revocation of [the] present suspended sentence and conditional release." *Id.* at 690. The D.C. Circuit nonetheless determined that the Parole Board had not acted unlawfully in holding Tippitt after the expiration of his four-year term to serve, consecutively, the entire remaining portion of the sentence on which he had been paroled, noting that "it was a legal impossibility for [the] [j]udge . . . to make the second sentence run concurrently with the first sentence[,] for this first sentence was not then running but had been suspended." *Id.* at 692; *see also Hendrix v. Bradt*, No. 08-civ-06275T, 2010 WL 3724688, at *6 (W.D.N.Y. Sept. 17, 2010) (distinguishing *Earley* on similar grounds). *Cf. Setser v. United States*, — U.S. —, 132 S. Ct. 1463, 1473 (2012) (reserving judgment on whether an inmate would be entitled to habeas relief if the Bureau of Prisons declined to credit his time served in state prison where the federal sentencing judge had ordered that his federal sentence run concurrently with one state sentence but consecutively to another, and the state court later decided that both state sentences should run concurrently with each other, rendering execution of the district court's instructions impossible).

Sudler and Batthany argue, to the contrary, that the State Defendants are incorrect as to New York law – that § 70.25(1) of New York's Penal Law clearly authorized their sentencing judges to direct that the time they served for their misdemeanor violations run concurrently with the time they were to serve for violating

25

parole, and that these directions could have and should have been carried out.[18] They reiterate, moreover, that even if their interpretation of New York law is incorrect, *Earley* makes clear that the illegality of a sentencing order does not affect an individual's right to serve only the sentence imposed by a sentencing court, until such time as this sentence is modified by a judge. They contend, finally, that there is no reason this precept should apply not only with regard to a single sentence, but also in the context of a sentencing judge's pronouncement as to the relationship between the sentence he is imposing and another sentence imposed in a separate proceeding.

We do not resolve the parties' substantial disagreements as to New York law, nor their disagreement as to the scope of *Wampler* and *Earley*. For the reasons that follow, we instead conclude that the district court correctly determined that the State Defendants are entitled to qualified immunity on the claim that their due process rights were violated when DOCS officials failed promptly to afford them PJT credits for the time served on their local sentences. Having also concluded, moreover, that in the circumstances here, we best follow that "older, wiser judicial counsel not to pass on questions of constitutionality . . . unless such adjudication is unavoidable," *Pearson v. Callahan*, 555 U.S. 223, 241 (2009) (quoting *Scott v. Harris*, 550 U.S. 372, 388 (Breyer, J., concurring)) (internal quotation marks omitted), we reach the

---

[18] Section 70.25(1) of the New York Penal Law provides that, absent statutory exceptions not relevant here, "when a person who is subject to any undischarged term of imprisonment imposed at a previous time by a court of this state is sentenced to an additional term of imprisonment, the sentence or sentences imposed by the court shall run either concurrently or consecutively with respect to . . . the undischarged term or terms in such manner as the court directs at the time of sentence."

26

determination that the State Defendants are entitled to qualified immunity without deciding the due process questions that this case presents.

*3.    Qualified Immunity*

Qualified immunity protects government officials from liability where the officials' conduct was not in violation of a "clearly established" constitutional right. *See, e.g., Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011). Qualified immunity is an affirmative defense, on which the defendant officials bear the burden of proof. *See Lore v. City of Syracuse*, 670 F.3d 127, 149 (2d Cir. 2012). "If the conduct did not violate a clearly established constitutional right, or if it was objectively reasonable for the [official] to believe that his conduct did not violate such a right, then the [official] is protected by qualified immunity." *Doninger*, 642 F.3d at 345 (alterations in original) (internal quotation marks omitted). Qualified immunity thus shields government officials from liability when they make "reasonable mistakes" about the legality of their actions, *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *abrogated on other grounds by Pearson*, 555 U.S. 223, and "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact," *Pearson*, 555 U.S. at 231 (internal quotation marks omitted). As we have said before, "[i]n this respect, the Supreme Court has observed that qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Walczyk v. Rio*, 496 F.3d 139,154 (2d Cir. 2007) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The State Defendants are clearly entitled to qualified immunity in the *Sudler* action. To repeat, Sudler's claim sounds in procedural due process: He alleges that, whatever New York law provides as to whether his misdemeanor sentences could properly run concurrently with his parole revocation sentence, the State Defendants violated his due process right, made explicit in *Earley*, to serve only the sentence pronounced by Justice Clancy until such time as this sentence was lawfully modified by a judge. Sudler's release date, however, was calculated by DOP personnel *prior to this Court's decision in Earley*, and Sudler was released from prison approximately one month after the issuance of our decision and one month before our denial of rehearing in that case.

It is true that *Earley* held that "clearly established Supreme Court precedent" – namely, *Wampler* – rendered invalid the five-year PRS term added to Earley's sentence by prison administrators, on the ground that the PRS term was not imposed by the sentencing court. *Id.* at 76. In *Scott v. Fischer*, however, we noted that the conclusion that a legal proposition is "'clearly established' for purposes of its application by professional state court judges" pursuant to AEDPA does not mean that it is "'clearly established' in the qualified immunity context, which governs the conduct of government officials who are likely neither lawyers nor legal scholars." 616 F.3d 100, 106 (2d Cir. 2010). Moreover, we went on to hold that *Wampler*, standing alone, was insufficient to establish clearly the right not to serve a term of PRS not imposed by sentence (the right at stake in *Earley*) for purposes of qualified immunity. *See id.* at 106-07.

28

The same logic applies to Sudler's detention. Even assuming, *arguendo*, that *Earley* applies so as to require the provision of PJT credits in circumstances like those here, because the State Defendants' conduct with respect to Sudler occurred prior to our decision in *Earley* (or, at the very latest, a few weeks after that decision and prior to our denial of the petition for rehearing), the only guidance available to the State Defendants as to the due process right at issue here was *Wampler*. We recognized in *Scott*, however, that for the purpose of qualified immunity, *Wampler* itself does *not* clearly establish the procedural right recognized in *Earley* not to have a custodial sentence extended except by a judge.[19] *See id.* We see no reason why *Wampler*, a seventy-year-old case that does not on its face mention the Constitution, could have given the State Defendants notice that administrative alteration of a sentence is in violation of an inmate's due process rights, any more than it could have given the defendants in *Scott* notice of the same. Thus, we cannot conclude that the State Defendants could "fairly be said to 'know'" that due process required that Sudler be afforded PJT credits for the time he served at Rikers. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

---

[19] In *Scott*, we also noted that *Earley* did not give rise to a clearly established affirmative legal duty on the part of DOCS "to seek resentencing for defendants with administratively-imposed PRS" or to revoke the PRS that had been administratively imposed. 616 F.3d at 111; *see id.* at 109. Because Sudler was released very shortly after our decision in *Earley*, we need not address *Scott*'s implications (if any) for the applicable qualified immunity analysis in a context in which an inmate's release date was calculated before *Earley* but the inmate remains in prison a significant period of time after its decision.

We also conclude that the State Defendants are entitled to qualified immunity in the *Batthany* suit. To be sure, Batthany's release date was calculated after our decision in *Earley*, and *Earley* recognized that a prisoner who is in custody as a result of a judicially-imposed sentence has a protected liberty interest in not having the term of this custodial sentence extended (even if the sentencing judge omitted some measure of punishment required by law) by a prison administrator, as opposed to a judge. The State Defendants are correct, however, that this holding, by its terms, does not instruct prison administrators as to the calculation of release dates when multiple sentences are at issue – and, indeed, one sentencing judge's instructions may conflict with another's. *Cf. Setser*, – U.S. at –, 132 S. Ct. at 1473 (noting but not deciding the question whether an inmate would be entitled to habeas relief if the Bureau of Prisons declined to credit his time served in state prison where the federal sentencing judge had ordered that his federal sentence run concurrently with one state sentence but consecutively to another, and the state court later decided that both state sentences should run concurrently with each other, rendering execution of the district court's instructions impossible).[20] Moreover, *Earley* does not employ the familiar three-factor analysis of *Mathews v. Eldridge*, 424 U.S. 319 (1976), to delineate what process prison

---

[20] *Earley* is also silent regarding the due process consequences of random and unauthorized mistakes by prison staff resulting in a prisoner serving a custodial term beyond that pronounced by a court. Generally speaking, when challenged state conduct "is random and unauthorized, the state satisfies procedural due process requirements so long as it provides [a] meaningful post-deprivation remedy." *Rivera-Powell v. N.Y.C. Bd. of Elections*, 470 F.3d 458, 465 (2d Cir. 2006).

30

officials should undertake to avoid impermissibly extending sentences in the context of implementing them.[21]

Batthany's release date was calculated in January 2008, some nineteen months after the *Earley* decision. In *Scott*, however, we left open the question whether *Earley* itself was enough "clearly to establish the unconstitutionality of administratively imposed PRS for a reasonable New York State correctional official," given the fact that New York *courts* continued to find this practice legally permissible after *Earley*, at least until two decisions of the New York Court of Appeals made clear that administrative imposition of PRS is contrary to law. 616 F.3d at 107. These New York Court of Appeals decisions were handed down on April 29, 2008, subsequent to DOP's calculation of Batthany's release date and just slightly more than a month before Batthany was released from DOCS custody. *See Garner v. N.Y. State Dep't of Corr. Servs.*, 889 N.E. 2d 467 (N.Y. 2008), *superseded in part by* N.Y. Penal Law § 70.85 *and* N.Y. Correct. Law § 601-d; *People v. Sparber*, 889 N.E. 2d 459 (N.Y. 2008), *superseded in part by* N.Y. Penal Law § 70.85 *and* N.Y. Correct. Law § 601-d. The great majority of district courts to have addressed the issue, moreover, have held that the right recognized in *Earley* did not become "clearly established" for qualified immunity

---

[21] To determine whether an inmate received the process he was due in relation to a claim that his sentence has been impermissibly altered, *Mathews* would instruct that a court consider: 1) "the private interest . . . affected by the official action"; 2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and 3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

31

purposes until April 2008. *See, e.g.*, *Locantore v. Hunt*, 775 F. Supp. 2d 680, 687 (S.D.N.Y. 2011) (noting that "the overwhelming consensus within the Second Circuit is that the protection of qualified immunity [for conduct in violation of *Earley*] applied until April 2008" and collecting cases). *But see Bentley v. Dennison*, Nos. 11-civ-1056 (SAS), 11-civ-3200 (SAS), 2012 WL 426551, at *4-12 (S.D.N.Y. Feb. 10, 2012) (finding that *Earley* clearly established the right in question).

We need not here decide the precise question whether "the unconstitutionality of administratively imposed PRS" was clearly established before April 2008. *Scott*, 616 F.3d at 107. Rather, the fact that New York courts continued to struggle with the implications of *Earley* until at least that date, combined with the critical differences between the case at bar – implicating multiple sentences – and the facts in *Earley*, are sufficient to convince us that the asserted unlawfulness of the State Defendants' conduct in calculating Batthany's release date would not have been apparent to reasonable prison officials. *See Young v. Cnty. of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998) ("[A] right is clearly established if . . . a reasonable official would understand that what he is doing violates that right. . . . [T]he unlawfulness must be apparent." (second alteration and second ellipsis in original) (internal quotation marks omitted)). Indeed, New York *courts* since the time of the conduct here have deemed lawful the practice of not affording PJT credits for time spent in local custody on sentences ordered to run concurrently with undischarged parole revocation sentences.[22] *See Strozak v. State of*

---

[22] We do not suggest that confusion among federal or state courts is either a necessary or a sufficient condition for qualified immunity to apply in a given factual

32

*N.Y.*, Cl. No. 115280, Decision, at \*4-5 (N.Y. Ct. Cl. Mar. 24, 2010); *Rivera v. State of N.Y.*, Cl. No. 114133, Decision, at \*8-9 (N.Y. Ct. Cl. Aug. 24, 2009). In such circumstances, we cannot fairly say that the illegality of failing to afford such credit should have been apparent to reasonable prison officials.[23]

Relying on a small number of out-of-circuit cases addressing the responsibility of prison officials to investigate when presented with cause to believe that a prisoner is being detained beyond his lawful term, Batthany argues that the State Defendants clearly violated due process by failing to act affirmatively to obtain appropriate documentation from local authorities yielding custody of inmates to DOCS so as to ascertain whether discharged sentences served in local custody may have been ordered to run concurrently with undischarged state sentences. *See, e.g.*, *Sample v. Diecks*, 885 F.2d 1099, 1115-16 (3d Cir. 1989); *Haygood v. Younger*, 769 F.2d 1350, 1354-55 (9th Cir. 1985) (en banc). Whatever the merits of this argument, however, it is beyond cavil that *Earley* did not settle them. Indeed, the issue was not even addressed in that case. Because *Earley* did not explicitly employ the *Mathews* balancing test in reaching its

---

context. We merely find that the existence of such confusion here, considered with the other circumstances of the case at bar, compels the conclusion that qualified immunity is appropriate.

[23] This conclusion is not altered, contrary to Batthany's claim, by the fact that the State Defendants have adopted a policy of affording such credits. For even assuming, *arguendo*, that this policy was violated by the conduct here, officials are not liable for violating constitutional rights that are "not clearly defined or perhaps not even foreshadowed at the time of the alleged violation . . . merely because their official conduct . . . violated some statute or regulation." *Davis v. Scherer*, 468 U.S. 183, 195 (1984).

conclusion, the State Defendants had little guidance in weighing the three *Mathews* factors in the circumstances confronting them. Nor can we conclude that the scattered out-of-circuit cases on which Batthany relies "clearly foreshadow[ed] a particular ruling" on the question what procedures should be employed to assess an inmate's claim that his sentence has been impermissibly altered. *Scott*, 616 F.3d at 105 (noting that decisions of other courts will be treated as clearly establishing the unconstitutionality of a course of conduct in such circumstances). These cases address the existence of a "duty to investigate" in the most general sense; they do not dictate the procedures a prison must employ to guide that investigation.

In sum, *Wampler* and *Earley* leave unanswered many questions regarding the scope of the due process right they articulate. The State Defendants cannot be expected to have divined answers to these questions at the time of their allegedly illegal conduct. Our conclusion does not in any way trivialize Plaintiffs' protected liberty interest in being promptly released upon expiration of the sentences to which they were subject, nor does it diminish the responsibility of prison administrators to ensure that the inmates entrusted to their care are not deprived of liberty longer than the period duly authorized by law. We cannot conclude, however, that reasonable prison officials would have understood at the time of the challenged conduct here that that conduct violated Plaintiffs' procedural due process rights under *Wampler* and *Earley*.

34

*4.    Other Matters*

a.    Declaratory Judgment

Although we have concluded that the State Defendants are entitled to qualified immunity for their allegedly illegal conduct, " [q]ualified immunity . . . does not bar actions for declaratory or injunctive relief." *Adler v. Pataki*, 185 F.3d 35, 48 (2d Cir. 1999). However, Plaintiffs' claim for declaratory judgment is moot. A declaratory judgment in Plaintiffs' favor would not shorten their term of imprisonment, since they have already been released from prison. Plaintiffs claim that they may be imprisoned again, and that a declaratory judgment on their behalf would entitle them to PJT credits for the time served in excess of the sentences imposed by their respective sentencing judges. However, we see no reason why a decision by this Court that DOP and DOCS should have run Sudler's and Batthany's local sentences concurrently with their parole violation sentences would compel DOP and DOCS to award Sudler or Batthany PJT credits on a completely unrelated third sentence. Thus, "[b]ecause [Plaintiffs] lack[] any continuing personal stake in the outcome of this appeal [as regards their declaratory judgment claim], it is rendered moot." *Muhammad v. City of N.Y. Dep't of Corr.*, 126 F.3d 119, 123 (2d Cir. 1997).[24]

---

[24] We are mindful that in certain instances "the claims of some named plaintiffs [may be preserved] for class certification purposes that might well be moot if asserted only as individual claims." *Amador v. Andrews*, 655 F.3d 89, 100 (2d Cir. 2011). Plaintiffs have not argued that they have standing to assert a claim for declaratory relief because of their status as would-be lead plaintiffs in a class action. Thus, we regard any such argument as waived. *See Norton*, 145 F.3d at 117.

35

b.      City Defendants

The City Defendants were dismissed from both the *Sudler* and the *Batthany* actions for failure to state a claim upon which relief may be granted, pursuant to Fed. R. Civ. P. 12(b)(6). Plaintiffs do not appeal the district court's decision to dismiss the *Sudler* action as against the City Defendants, since the record suggests that DOP employee Linda Stevens did receive a copy of Sudler's Sentence and Commitment form, and thus Sudler was not harmed by any action of the City Defendants. Plaintiffs argue, however, that dismissal of the *Batthany* suit was inappropriate, since NYCDOC failed to send a copy of Batthany's Sentence and Commitment form to DOP, which, they argue, was a causal factor in DOP's and DOCS's failure to honor the concurrent nature of the sentence imposed by the sentencing judge.

Our holding with regard to the State Defendants' entitlement to qualified immunity in the *Batthany* action is dispositive of this issue as well. Although the district court did not reach the question of whether qualified immunity precludes liability for the City Defendants, we "may affirm an appealed decision on any ground which finds support in the record, regardless of the ground upon which the trial court relied." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 580 (2d Cir. 2006) (internal quotation marks omitted). We have concluded above that *Wampler* and *Earley* are insufficient to have alerted the State Defendants to any illegality in their alleged policy of requiring an inmate who contends that his sentencing judge ordered one or more of his local sentences to run concurrently with his state sentence to provide acceptable documentation of such an order. It follows that

36

these cases are also insufficient to have alerted the City Defendants that any failure on their part to ensure that the State Defendants received such documentation, at least so long as the documentation was unrequested by the inmate in question, violated the inmate's constitutional rights.[25]

c. Class Certification and Denial of Leave to Amend

Plaintiffs argue that the district court erred by declining to certify the putative plaintiff class. However, since "a class action cannot be sustained without a named plaintiff who has standing," *Amador v. Andrews*, 655 F.3d 89, 99 (2d Cir. 2011), the district court correctly denied the motion for class certification as moot.

Plaintiffs also argue that they should have been given leave to file a third consolidated class action complaint to "set[] forth – in light of what was learned in the voluminous discovery taken in this matter – the accurate and detailed facts underlying the State Defendants' application of their unwritten policy, and [to] add[] certain defendants whose roles only became known during discovery." Appellants' Br. at 57.

---

[25] Plaintiffs contend briefly that the district court erred by dismissing, in the exercise of its discretion, Batthany's state law claims against the City Defendants, on the theory that "the District Court would have properly exercised supplemental jurisdiction over those claims since they arose from the same set of events being adjudicated with regard to the federal claims against the State Defendants." We need not decide whether the district court's dismissal of Batthany's state law claims was error at the time of dismissal, because the district court has now dismissed all the federal claims in this case, thus permitting the discretionary dismissal of the state law claims. *See* 28 U.S.C. § 1367(c)(3) (permitting a district court to dismiss claims over which it may otherwise exercise supplemental jurisdiction if it has "dismissed all claims over which it has original jurisdiction"); *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("[A] district court's discretion is triggered under § 1367(c)(3) . . . ."). Plaintiffs do not argue that the district court's dismissal of Batthany's state law claims was an abuse of discretion.

37

However, the fatal deficiency in Plaintiffs' suit is not a failure to set forth in sufficient factual detail the conduct of the State (or City) Defendants, but the lack of a clearly established right the contours of which are sufficiently apparent to have alerted the Defendants to the unlawfulness of their conduct. Plaintiffs could add no facts to their complaint that would change in their favor the state of the law. Thus, the proposed amendment would be futile, and the district court properly denied leave to amend. *See Van Buskirk v. The N.Y. Times Co.*, 325 F.3d 87, 92 (2d Cir. 2003).

## CONCLUSION

We have considered all of Plaintiffs' arguments and reject them as meritless. For the foregoing reasons, the judgment of the District Court is AFFIRMED.